CARMEN I. SEPÚLVEDA DE ARRIETA y ANTONIO ARRIETA PLÁ, demandantes y recurrentes, *v.* DR. ARMANDO BARRETO DOMÍNGUEZ y la CORPORACIÓN INSULAR DE SEGUROS, demandados y recurridos.

*Número:* RE-90-41          *Resuelto:* 23 de diciembre de 1994

*Miguel A. Cintrón Quirós*, abogado de los recurrentes; *Efrén T. Irizarry Colón* y *Elisa M. Figueroa Báez*, del *Bufete Irizarry Colón*, abogados de los recurridos.

El Juez Asociado Señor Negrón García emitió la opinión del Tribunal.

Evaluamos nuevamente una reclamación por impericia médica fundamentada, en esta ocasión, en que la Sra. Carmen I. Sepúlveda de Arrieta fue sometida a una blefaroplastía[1] para corregirle un xantelasma[2] y que por la alegada negligencia del Dr. Armando Barreto Domínguez, desarrolló un ectropión.[3]

I

La Señora Sepúlveda de Arrieta visitó las oficinas del doctor Barreto Domínguez, cirujano plástico, para hacerse una operación, con fines cosméticos, de remoción de unas "grasitas" y de un tejido flácido que tenía debajo de sus ojos.

La operación no requería hospitalización, pero sí que se realizara en una sala de operaciones. El 19 de junio de

---

[1] Cirugía plástica para corregir defectos en el área del párpado. *Dorland's Medical Dictionary*, Filadelfia, W.B. Saunders Co., 1980, pág. 98; 6 *Medical Malpractice: Guide to Medical Issues* Sec. 154.01[1], pág. 154-3 (1992).

[2] El xantelasma es una pápula, nódulo o placa amarilla localizada en el párpado debido a depósitos lípidos. Xantomatosis marcada por máculas planas o placas levemente elevadas localizadas en el párpado y de color amarillo o naranja. *Dorland's Medical Dictionary*, Filadelfia, W.B. Saunders Co., 1980, pág. 737.

[3] *Ectropión* es una complicación común de las blefaroplastías. Consiste en la combadura, doblés, eversión o volteo al revés del margen del párpado. *Dorland's Medical Dictionary, op. cit. Medical Malpractice: Guide to Medical Issues*, supra, Sec. 154.04[3], pág. 154-35.

1979 ella acudió al Hospital Presbiteriano y firmó una hoja de "Consentimiento para operación y/u otros procedimientos" en la que se hacía constar que antes de la operación se le había informado que el procedimiento a realizarse conllevaba los riesgos de hemorragia y hematoma.[4] En horas de la mañana, fue operada ambulatoriamente por el doctor Barreto y regresó a su hogar al mediodía. Dos (2) días después volvió a la oficina del galeno para que le cortara los puntos de la herida. Un mes más tarde le removió uno adicional.

Con posterioridad, realizó visitas semanales a la oficina del doctor Barreto. En todas se quejó de ardor, picor y exceso de lágrimas. También notaba los ojos muy inflamados. El doctor Barreto le indicó que eran condiciones pasajeras y le recomendó el uso de gotas y ungüentos para los ojos. La Señora Sepúlveda de Arrieta también le manifestó que su esposo Antonio le decía que dormía con los ojos abiertos.

A los cinco (5) meses no notaba mejoría. En noviembre de 1979 visitó al oftalmólogo Dr. Federico Maestre. Este le diagnosticó keratitis[5] y le recomendó el uso de lágrimas artificiales, otro ungüento y una operación para corregirle la condición.

En 1980, tanto el doctor Maestre como el Dr. Elías Rufo Rosa, también oftalmólogo, le diagnosticaron la condición de ectropión en los párpados inferiores y ambos le recomendaron una operación correctiva.[6]

El Tribunal Superior, Sala de San Juan (Hon. Pedro López Oliver, Juez), determinó que a esa fecha y diez (10)

---

[4] El inciso cuatro de esa hoja dispone:

"4.    Me (nos) ha sido informado y alertado de ciertos riesgos y consecuencias asociadas con el procedimiento y/o procedimientos a realizarse que son: hemorragia [y] hematoma." E.N.P., págs. 1–2.

[5] La *keratitis* es una inflamación de la córnea que, a su vez es la capa transparente que cubre la parte anterior del globo del ojo. *Dorland's Medical Dictionary, op. cit.,* pág. 366.

[6] Se le recomendó una "tarzoplastía", procedimiento quirúrgico en que se acorta el tarso hacia el lado para afirmarlo, logrando que el párpado pegue al ojo. *Dorland's Medical Dictionary, op. cit.,* pág. 655.

meses después de la operación, cuando fue evaluada por el doctor Rufo Rosa, ella sufría de una condición de ectropión y probablemente también de *scleral show*. De acuerdo con su apreciación del testimonio de los peritos de ambas partes, la condición de ectropión ha estado combinada con una denominada *scleral show*.(7) Esta es producida, entre otros factores, por el proceso de envejecimiento. Sin embargo, conforme al testimonio de todos los peritos y de la propia señora Sepúlveda de Arrieta, esa condición ha mejorado con el transcurso del tiempo.

Determinó, también, que al momento de dictar la sentencia sufría de ectropión leve en su ojo derecho (el cual se hace evidente cuando mira hacia arriba), acompañado del *scleral show* causado por la laxitud de la piel que produce el proceso de envejecimiento. No obstante, al tribunal sentenciador le mereció crédito el testimonio del perito de la parte demandada, Dr. Walter Kleis, a los efectos de que la señora Sepúlveda de Arrieta tenía suficiente producción de lágrimas y sus ojos cerraban adecuadamente.

Fundamentándose en el testimonio del doctor Kleis y en la literatura médica,(8) concluyó que las condiciones de ectropión post operatorio y de *scleral show* "son dos de las complicaciones más reconocidas en [una operación de] blefaroplastía", que *"dichas complicaciones son las más comunes"* y que "pueden resultar de una blefaroplastía aún bajo las manos más diestras". (Énfasis suplido.) E.N.P., pág. 12. Determinó que por la prueba presentada no le era posible concluir que el doctor Barreto Domínguez hubiera extraído piel en exceso durante la blefaroplastía. Desestimó la demanda.

---

(7) Condición de visibilidad de la sclera o sclera expuesta. La *sclera* es la capa blanca que cubre la parte externa del globo del ojo, desde la córnea en la parte anterior del ojo hasta la cubierta externa del nervio óptico en la parte posterior. *Dorland's Medical Dictionary, op. cit.*, pág. 602.

(8) El Tribunal Superior citó las obras siguientes: *Reconstructive Plastic Surgery*, 2da ed., pág. 1894; *Tansconjunctival Lower Eyelid Blepharoplasty–Technique and Complications*, 96 Journal of American Academy of Oftalmology 1031.

Con el beneficio de los autos originales y la Exposición Narrativa de la Prueba, mediante orden de mostrar causa, evaluamos el recurso instado por la señora Sepúlveda de Arrieta.

## II

Analicemos inicialmente los errores Uno y Tres que giran en torno a la determinación de ausencia de negligencia. *No fueron cometidos.* En las alegaciones de la demanda no se hicieron imputaciones específicas de negligencia. Del Informe sobre Conferencia Preliminar entre abogados se infiere una imputación, a los efectos de que el doctor Barreto Domínguez cortó piel en exceso durante la operación. La prueba no lo demostró. El perito de la demandante señora Sepúlveda de Arrieta se limitó a probar que la condición de ectropión *es una complicación común de la blefaroplastía.*

Ahora bien, el segundo error cuestiona la conclusión de que su consentimiento no estuvo viciado. El tribunal sentenciador se limitó a concluir que ella no hizo alegación alguna al respecto. *Erró.*

Aunque no hubo alegación específica, la señora Sepúlveda de Arrieta testificó que nadie le había comunicado que existiera el riesgo de quedar con los ojos abiertos como resultado de la operación, y que antes de someterse a ella firmó un documento que *únicamente* le advertía que se exponía a los riesgos de hemorragia y hematomas. E.N.P., pág. 2. *La parte demandada no objetó esa declaración.* En otras palabras, ante la ilustrada sala sentenciadora se desfiló y admitió prueba sobre la falta de consentimiento informado. Ello activó la Regla 13.2 de Procedimiento Civil, 32 L.P.R.A. Ap. III, y, por ende, sus alegaciones quedaron implícitamente enmendadas por esa prueba. *Canales Velázquez v. Rosario Quiles*, 107 D.P.R. 757 (1978). También ella manifestó enfáticamente que de haber sabido que

la blefaroplastía le iba a causar tantas molestias, jamás se hubiese sometido a ella. E.N.P., pág. 3. No hay constancia de que se objetara su admisibilidad. Evaluemos, pues, el recurso desde esta perspectiva.

### III

■ El derecho de todo paciente a la autodeterminación, es decir, a decidir libremente qué debe hacerse con su cuerpo, está protegido por los tribunales. Como regla general, implica la previa prestación del consentimiento informado del paciente para toda intervención quirúrgica. *Rojas v. Maldonado*, 68 D.P.R. 818 (1948); *Montes v. Fondo del Seguro del Estado*, 87 D.P.R. 199 (1963); *Torres Pérez v. Hosp. Dr. Susoni, Inc.*, 95 D.P.R. 867 (1968); *Pueblo v. Najul Bez*, 111 D.P.R. 417, 422 (1981); *Colón Prieto v. Géigel*, 115 D.P.R. 232 (1984); *Ríos Ruiz v. Mark*, 119 D.P.R. 816 (1987); *Rodríguez Crespo v. Hernández*, 121 D.P.R. 639 (1988). Ello no supone que los médicos estén obligados a dar a sus pacientes un curso completo de medicina, pero sí a suministrarles suficiente información sobre la naturaleza del tratamiento, los riesgos y las complicaciones implicados y los beneficios que se esperan. *Ríos Ruiz v. Mark*, supra, pág. 828.

En el caso de autos debemos examinar si, como requisito previo a la realización de la blefaroplastía, el doctor Barreto Domínguez tenía el deber de informar sobre el riesgo de ectropión, y si en la afirmativa, determinar las consecuencias jurídicas de su omisión.

■ En el pasado nos hemos expresado sobre el deber médico de suministrar al paciente información sobre la naturaleza del tratamiento, los riesgos y los beneficios —*Rodríguez Crespo v. Hernández*, supra; *Ríos Ruiz v. Mark*, supra— y algunos de sus contornos. La cuestión no es sencilla, pues existe diversidad de criterios. Los tribunales estatales en Estados Unidos están divididos en dos (2) ten-

dencias con casi igual número de jurisdicciones adeptas. Furrow, *Health Law: Cases, Materials and Problems*, St. Paul, West Publishing Co., 1987, Cap. 3, Sec. II, págs. 231–249. La tendencia mayoritaria es darle a este deber el alcance que determina la práctica prevaleciente en la comunidad médica.[9] Al adoptar este criterio, algunos tribunales han sostenido que una vez el actor prueba que el médico falló en informarle de los riesgos inherentes a un procedimiento, el peso de la prueba recae sobre éste, quien deberá probar que esa omisión está avalada por la práctica prevaleciente de la medicina. *Blades v. DaFoe*, 666 P.2d 1126 (Colo. App. 1983), 704 P.2d 317 (1985). Estas jurisdicciones requieren generalmente que el demandante ofrezca testimonio pericial para establecer que: (1) un profesional médico razonable, siguiendo criterios prevalecientes en la práctica de la profesión y situado en unas circunstancias similares, hubiera divulgado la información, y (2) que el demandado no cumplió ese criterio profesional prevaleciente. *Fuller v. Starnes*, 597 S.W.2d 88 (1980).

El razonamiento tras este criterio responde a que, dada la complejidad de las ciencias médicas, los profesionales de la salud están en mejor posición que los tribunales o los jurados para determinar cuáles riesgos ameritan divulgación. En *primer* lugar, el deber primario de todo médico es adelantar los intereses de salud de sus pacientes y no estar preocupándose por el riesgo de que un tribunal inexperto en cuestiones médicas determine luego que actuó impropiamente. *Woolley v. Henderson*, 418 A.2d 1123 (Me. 1980). *Segundo*, seguir el criterio subjetivo del paciente

---

[9] Idaho Code, Sec. 39-4304 (1977); N.Y. Pub. Health Law, Sec. 2805-d(1) (McKinney 1977); Tenn. Code Ann. Sec. 29-26-118 (1980); *Hook v. Rothstein*, 316 S.E.2d 690 (1984).

El voto particular de la Juez Asociada Señora Naveira de Rodón en *Ríos Ruiz v. Mark*, 119 D.P.R. 816, 848 (1987), parece favorecer esta tendencia:

"Bajo las circunstancias de este caso, antes de imponer responsabilidad al doctor Mark por haber faltado a su deber de información, era necesario probar que existía ese deber de información como práctica prevaleciente en la comunidad médica. *Oliveros v. Abreu*, 101 D.P.R. 209, 226 (1973); *Cruz v. Centro Médico de P.R.*, 113 D.P.R. 719 (1983)."

obligaría al médico a incurrir en tiempo excesivo en explicar y discutir con el paciente todo riesgo posible, incluso los más remotos e inmateriales. 2 *Medical Malpractice* Sec. 22:06.

Por otro lado, la tendencia minoritaria utiliza la figura del "paciente razonable", criterio originado en *Canterbury v. Spence*, 464 F.2d 772 (Cir. D.C. 1972). Ha sido adoptado en varias jurisdicciones estatales: *Logan v. Greenwich Hosp. Ass'n.*, 465 A.2d 294 (Conn. 1983); *Harnish v. Children's Hosp. Med. Center*, 439 N.E.2d 240 (Mass. 1982); Pa. Stat. Ánn. tit. 40, Sec. 1301.103 (Purdons Supp. 1985); Rev. Code Wash. Sec. 7.70.050(2) (Supl. 1985). En *Canterbury v. Spence*, supra, se rechazó la idea de que el deber de informar está determinado o delimitado por la práctica prevaleciente en la profesión médica. Allí se impuso la obligación de informar todo riesgo material, definido éste como todo aquel riesgo al que una persona razonable, colocada en el lugar del paciente, daría importancia al momento de decidir si consiente a la terapia o al procedimiento propuesto.[10]

Dicho tribunal razonó que posiblemente en algunos casos la práctica prevaleciente de la profesión no habría formado un criterio discernible del ámbito del deber de informar. Además, atribuir a la profesión médica la determinación de qué información debe divulgarse, podría ir en detrimento del derecho de autodeterminación de los pacientes. *A Contrario sensu*, de "paciente razonable" evitaría el temor al prejuicio profesional en favor de la no divulgación motivada por consideraciones ajenas a los intereses terapéuticos del paciente. T.J. Schneyer, *Informed Consent and the Danger of Bias in the Formation of Medi-*

---

[10] El texto original en inglés dice lo siguiente: "In broad outline, we agree that '[a] risk is thus material when a reasonable person, in what the physician knows or should know to be the patient's position, would be likely to attach significance to the risk or cluster of risks in deciding whether or not to forego the proposed therapy.' " *Canterbury v. Spence*, 464 F.2d 772, 787 (Cir.D.C.1972).

*cal Disclosure Practices*, 1976 (Núm. 1) Wis. L.Rev. 124 (1976).

El efecto del criterio fundamentado en el "paciente razonable" es que la determinación del ámbito preciso del deber de informar se convierte en una cuestión de adjudicación fáctica no pericial. No obstante, el testimonio pericial sigue siendo necesario en las jurisdicciones que han adoptado *Canterbury v. Spence*, supra. Aunque bajo este criterio no es preciso presentar a los peritos médicos para probar cuáles riesgos son materiales, lo será para establecer que la materia no divulgada era un riesgo, efecto, alternativa u otro aspecto inherente al procedimiento en cuestión, así como la prognosis si el paciente quedaba sin tratamiento.[11] También es necesario el testimonio de un perito para establecer si un médico razonable, conforme los criterios prevalecientes en la práctica de la profesión, debió estar al tanto de esa información.[12] *Cross v. Trapp*, 294 S.E.2d 446, 455 (W. Va. 1982); *Festa v. Greenberg*, 511 A.2d 1371 (1986).[13] Finalmente, bajo este criterio de adjudicación, el testimonio pericial es necesario para establecer que el daño sufrido por el paciente fue causado, en efecto, por la

---

[11] Algunas jurisdicciones que han adoptado el criterio de *Canterbury v. Spence*, 464 F.2d 772 (Cir. D.C. 1972), no sólo exigen la divulgación de riesgos materiales, sino también la descripción de alternativas de tratamientos y la prognosis, en caso de omitir el tratamiento. *Canterbury v. Spence*, supra, págs. 787–788. Otras han exigido la divulgación del diagnóstico, la naturaleza general del procedimiento y su probabilidad de éxito. *Hook v. Rothstein*, 316 S.E.2d 690 (1984). Se ha sugerido, también, que el incumplimiento del deber de informar sobre la naturaleza general de procedimiento podría dar lugar a una reclamación por agresión, cuando la información ofrecida fue tan poca que pueda sostenerse que el consentimiento del paciente fue inválido. King, *The Law of Medical Malpractice*, St. Paul, West, 1986, pág. 161.

[12] Independientemente de cuál sea el criterio de divulgación aplicado, un proveedor de servicios médicos sólo debe saber de aquellos riesgos e información que otros médicos en circunstancias similares deberían conocer. Por lo tanto, antes de poder exigir la divulgación de información, es menester determinar si un médico razonable debería tener conocimiento de ella. En vista de esto el deber de información generalmente no será más amplio que el ámbito del conocimiento exigido al médico razonable, sin embargo, podría ser más estrecho que aquél, dependiendo del criterio de divulgación aplicable. *Holton v. Pfingst*, 534 S.W.2d 786 (Ky. 1975).

[13] Ver P.D. Halligan, *The Standard of Disclosure by Physicians to Patients: Competing Models of Informed Consent*, 41 (Núm. 1) La. L. Rev. 9 (1980); J. Katz, *Informed Consent—A Fairy Tale? Law's Vision*, 39 (Núm. 2) U. Pitt. L. Rev. 137 (1977).

materialización del riesgo sobre el cual no hubo divulgación adecuada.

A modo de una breve travesía, en Inglaterra los tribunales no se expresaron sobre la extensión del deber de informar, corolario del requisito de consentimiento informado, hasta 1985, cuando la Cámara de los Lores resolvió *Sidaway v. Bethlem Royal Hospital Governors*, 1 All ER 643 (House of Lords 1985). En *Sidaway* la mayoría acogió el criterio de la práctica profesional aceptada, según establecida por la comunidad médica.[14]

■ España, como otros países del viejo continente, propugna que la obligación de no actuar sobre el cuerpo del paciente sin su consentimiento libre, conlleva la de informar al paciente.[15] Ataz López no conoce ningún autor que, habiéndose ocupado del tema de la responsabilidad civil o sobre aspectos concretos de la actividad médica, haya negado dicho deber de informar. J. Ataz López, *Los médicos y la responsabilidad civil*, Madrid, Ed. Montecorvo, 1985, pág. 69 esc. 62. Nos dice que el consentimiento "contribuye a legitimar la actuación médica al ser una manifestación del poder de disposición sobre el propio cuerpo, o *ius in se*

---

[14] Hay quien sugiere que tras la deferencia judicial de la cual ha sido objeto la profesión médica inglesa, se encierra el propósito ulterior de conservar recursos médicos, o lo que podríamos denominar un ánimo de "economía médica". En un país en el que los recursos médicos están comprometidos al Sistema Nacional de Salud, el tratamiento jurídico dado al asunto del consentimiento informado sirve para mantener a los pacientes faltos de información sobre conocimientos que generarían un aumento en la demanda de servicios (por ejemplo, información sobre alternativas de tratamiento, algunas de las cuales podría ser más costosa). Shwartz and Grubb, *Why Britain Can't Afford Informed Consent*, 16 Hastings Center Report 22 (1986); Miller, *Informed Consent for the Man on the Clapham Omnibus: An English Cure for the "American Disease"?*, 9 W. New Eng. L. Rev. 169 (1987).

[15] Entre la literatura consultada, vemos: J. Ataz López, *Los médicos y la responsabilidad civil*, Madrid, Ed. Montecorvo, 1985, págs. 59–60; T.E. Carbonneau, *The Principles of Medical and Psychiatric Liability in French Law*, 29 Int'l & Comp. L.Q. 742, 743 (1980); J.M. Fernández Hierro, *Responsabilidad Civil Médico-Sanitaria*, Pamplona, Ed. Aranzadi, 1984, pág. 64 y ss.; L. Martínez-Calcerrada, *Derecho Médico*, Madrid, Ed. Tecnos, 1986, Vol. I, pág. 18; C.M. Romeo Casabona, *El médico y el Derecho Penal*, Barcelona, 1982, T.I, pág. 327 y ss.; J. Santos Briz, *La responsabilidad civil: derecho sustantivo y derecho procesal*, 2da ed. rev., Madrid, Ed. Montecorvo, 1991, Vol. II, pág. 822; J. Santos Briz, *La responsabilidad civil de los médicos en el Derecho español*, julio-agosto 1984 Rev. Der. Priv. 671 (1984).

*ipsum*, del que toda persona goza". Ataz López, *op. cit.*, págs. 59 y 60. Martínez-Calcerrada distingue cuatro características del "acto médico": la profesionalidad, la ejecución típica o regular, la persecución de una finalidad sanitaria y la *licitud*. L. Martínez-Calcerrada, *Derecho Médico*, Madrid, Ed. Tecnos, 1986, Vol. I, pág. 88.

En cuanto a la capacidad para prestar consentimiento rigen, en principio, las reglas generales del Código Civil. Martínez-Calcerrada, *op. cit.*, pág. 91; Ataz López, *op. cit.*, pág. 65. En todo caso, habrá de emitirse libre y concientemente, lo que supone ausencia de vicios que afecten la voluntad del enfermo.(16) Rige aquí la teoría general de los vicios de la voluntad, de manera que el consentimiento viciado por error, dolo, violencia o intimidación no producirá los efectos autorizantes y convalidantes de la actuación médica. Martínez-Calcerrada, *op. cit.*, pág. 92. Ataz López señala que en tales casos estaríamos ante un tratamiento médico no consentido por el paciente. Plantea, sin embargo, la necesidad de tomar en cuenta un importante dato: que el enfermo cuyo consentimiento es solicitado, es normalmente un profano en medicina y desconoce las consecuencias de su situación de enfermedad (riesgos, prognosis, medios idóneos de tratamiento, etc.). Ataz López, *op. cit.*, pág. 68. De la misma forma, cuando el médico propone al paciente un tratamiento a seguir, éste, generalmente, no tiene forma de saber —a no ser que haya sido informado de ello— si tal tratamiento es el adecuado ni

---

(16) Sobre los requisitos del consentimiento, expone Martínez-Calcerrada, *op. cit.*, pág. 91, que ha de ser válido, queriendo decir con ello que habrá de ser emitido por un sujeto capaz y que su declaración —expresa, tácita o presunta— tendrá que ser formalmente correcta y no verse afectada por vicios de la voluntad.

Ataz López, *op. cit.*, pág. 65, dice que el consentimiento del paciente es en realidad una manifestación de voluntad aceptando el tratamiento y, como tal, ha de ser libre y consciente; por lo cual debe reunir los requisitos generales que toda manifestación de voluntad ha de tener para ser jurídicamente relevante y eficaz, es decir, capacidad suficiente para consentir en el acto de que se trate y ausencia de vicios de la voluntad.

cuáles son los riesgos que correrá durante el mismo. En tales circunstancias, señala:

> ... parece claro que el consentimiento prestado por el enfermo no pasaría de ser un molde vacío. No podría hablarse de un consentimiento libre y consciente desde el momento en que quien lo otorga no sabe en qué ni por qué consiente. Y esta ignorancia convertiría al consentimiento prestado por el paciente, cuando menos, en un consentimiento prestado por error; error este que aparece claro cuando el paciente no sabe, cuál es su necesidad, ni cuáles pueden ser sus consecuencias. (Énfasis suprimido.) Ataz López, *op. cit.*, pág. 68.

El problema no está, por lo tanto, en determinar cuándo, de quién o de qué forma se debe exigir el consentimiento, sino de qué condiciones debe informar el médico al paciente, ya que será esa información la que permitirá al paciente acceder u oponerse al tratamiento. Esto nos trae ante nuestra consideración el primer problema en el presente caso: ¿Cuál es la extensión del deber del médico de informar a su paciente?

■ El tema de informar al paciente acerca del diagnóstico ha suscitado en la doctrina unas controversias de difícil solución, sobre las cuales no es necesario entrar en este caso.[17] Con respecto al tratamiento, es decir, las medidas terapéuticas concretas, dice Ataz López que el médico debe informar al paciente sobre los riesgos que pueden producirse con más frecuencia, riesgos a los que algún sector de la doctrina alemana ha denominado "riesgos típicos"[18] y que son, para Ataz López, *"los que, conforme a la experiencia y al estado actual de la ciencia, en mayor medida pue-*

---

[17] Santos Briz, *op. cit.*, pág. 822; Santos Briz, *supra*, pág. 643.

[18] La jurisprudencia y algún sector doctrinal han utilizado, para concretar los riesgos típicos, unos porcentajes aplicables a un número determinado de casos. Así, se estima que hay un deber de informar cuando tales riesgos aparecen en un porcentaje que oscila de unos a otros entre el cinco (5) y el diez (10) por ciento. Sin embargo, a Ataz López no le parece aceptable este procedimiento, pues parte de una generalización difícilmente conciliable con las particularidades que se presentan al médico en cada caso concreto. Ataz López, *op. cit.*, pág. 73, esc. 69.

*den darse en cada tratamiento"*. (Énfasis suplido.) Ataz López, *op. cit.*, pág. 73. Sin embargo, él mismo señala:

> *Según la importancia y urgencia de la intervención, la información habrá de ser más o menos exhaustiva, de forma que, si la intervención es innecesaria, el facultativo habrá de ampliar su información, exponiendo incluso los riesgos que más raramente se dan.* También debe versar la información sobre los posibles efectos secundarios, y, en general, acerca de las probabilidades de éxito o fracaso, así como sobre la previsión del estado del paciente en caso de éxito o de fracaso del tratamiento propuesto. (Énfasis suplido y en el original.) Ataz López, *op. cit.*, pág. 73.

Sobre la extensión de la obligación, Ataz López coincide y cita a Doll, respecto a la norma seguida por la Corte de Casación francesa, a los efectos de que dicha extensión dependerá del carácter y de la naturaleza de la intervención médica propuesta:[19]

> La extensión de la obligación de aleccionar al enfermo para obtener su consentimiento es esencialmente variable. Depende fundamentalmente de la naturaleza de la intervención prevista. Si se trata de un intento de salvación, el cirujano debe ante todo crear un clima favorable. *Si la intervención es simplemente útil, le corresponderá ser más preciso en sus informes. Deberá señalar todos los riesgos que se dan, incluso raramente; pero no los que son demasiados hipotéticos. En fin, cuando la intervención pueda ser considerada casi como un lujo, el médico deberá informar al paciente de una forma más precisa, y señalarle todos los riesgos, incluso los excepcionales.* (Énfasis en el original suprimido y énfasis suplido.) Ataz López, *op. cit.*, pág. 74.[20]

---

[19] Según Doll, la norma en Francia permite que la información ofrecida al paciente sea simple y aproximativa, pero exige que sea, a su vez, inteligente y leal, de forma que el lenguaje técnico sea transpuesto y se vuelva accesible a los profanos. Boyer Chammard y Monzein: *La Responsabilité Medicale*, Vendome, 1974, pág. 146, citado en Ataz López, *op. cit.*, pág. 73.

[20] El paciente está en libertad de renunciar a la información y que un consentimiento desinformado al acto médico podría no ser un consentimiento ciego y sí estar fundamentado en la confianza que le inspira el médico al enfermo.

"En este sentido hay que tener en cuenta que los médicos no están obligados a impartir a sus pacientes un curso completo de medicina cada vez que éstos se sometan a un acto médico, sino que en principio puede pensarse que cuando una persona se dirige a un médico, pone en él su confianza, y pretende que éste le cuide de

La doctrina, en general, advierte de los peligros de formular generalizaciones en relación con el deber de informar. *Primero*, porque pocas actividades se ven tan afectadas como la médica por un mayor cúmulo de circunstancias variables (condición que ha llevado a la doctrina a someter la actividad médica a los principales dictados de la denominada *lex artis ad hoc*). *Segundo*, porque "la información que en posesión del paciente condiciona su consentimiento no es necesario que abarque todo el grupo de circunstancias antes enumeradas, pues una exigencia tan amplia conllevaría a la pérdida de la necesaria confianza y al retraso, cuando no a la paralización, en la prestación de los servicios médicos". Martínez-Calcerrada, *op. cit.*, pág. 93. En definitiva, se sugiere que el deber de información posee una extensión indefinida que debe concretarse en atención a lo expuesto según cada caso, por lo que la regla general deberá ser matizada en cada supuesto conforme al grado de información del paciente y el acto concreto que el

---

acuerdo con sus conocimientos, por lo que en principio acepta todos los actos terapéuticos del médico. Precisamente la información leal está en la advertencia por parte del médico de aquellos peligros desconocidos para el enfermo, que éste no puede saber, porque cuando se dice que la información ha de ser leal y honesta, se quiere decir que el médico no debe traicionar la confianza que en él ha puesto el paciente." (Énfasis suprimido.) Ataz López, *op. cit.*, pág. 74.

Por su parte, Martínez-Calcerrada discrepa de Ataz en cuanto éste, más que al consentimiento, se refiere a la aceptación de la actuación sobre el propio cuerpo, a una adhesión al acto médico como conformidad obtenida por el médico antes de proceder.

"En realidad lo que es requerido es el consentimiento del que va a ser intervenido, manifestación de voluntad primaria sin la cual no hay actuación lícita. Por ello, y en consecuencia, surge derivativamente el deber de *abstención* del médico, pero no sustitutivamente como parece proponer Ataz, sino como resultado directo de la inicial exigencia de consentimiento en el enfermo." (Énfasis suplido.) Martínez-Calcerrada, *op. cit.*, págs. 89–90.

Entiende, además, que el consentimiento prestado por el paciente tendrá validez, a los efectos de conferir licitud al correspondiente acto médico, cuando los posibles vicios afectantes de la declaración de voluntad del enfermo no provengan del facultativo. Concluye que el consentimiento ignorante es válido siempre que la falta de conocimiento condicionante de la propia prestación del consentimiento no derive de una falta imputable al médico actuante, quien por su parte habrá de cumplir con el deber de informar —a falta de solicitud del paciente— *"según los dictados de su ciencia y su conciencia atendiendo a los condicionantes del caso concreto"*. (Énfasis suplido.) Martínez-Calcerrada, *op. cit.*, pág. 94.

médico propone. Martínez-Calcerrada, *op. cit.*, págs. 93 y 97. Para esto se hace necesaria la formulación de unos criterios generales que guíen, en nuestra jurisdicción, la determinación caso a caso del contenido particular de la obligación de informar. Acometamos la tarea.

## IV

En *Rodríguez Crespo v. Hernández*, supra, págs. 664–665, el Tribunal citó con aprobación la doctrina establecida en *Canterbury v. Spence*, supra. Sin embargo, luego señaló que:

> El médico tiene la obligación de divulgarle al paciente los riesgos *razonablemente previsibles*, así como los beneficios de tratamientos y procedimientos invasivos del cuerpo humano y de las alternativas disponibles. También debe informar al paciente sobre los *riesgos probables* relacionados a no tratarse la condición.
>
> Sin embargo, el médico no es responsable por no divulgar riesgos que razonablemente no pueda preveer o por no informar de alguna secuela inesperada que surja durante la cirugía. ... *En general, el médico debe divulgar aquella información que él razonablemente crea o deba saber que genere un riesgo.* Ello no significa que deba comunicar aquellos riesgos de los cuales un paciente promedio estaría advertido o sobre aquellos que el paciente particular haya descubierto por haber sido sometido a un tratamiento similar en el pasado. *Revord v. Rusell*, 401 N.E.2d 763 (1980); *Vergie M. Lapelosa, Inc. v. Cruze*, 407 A.2d 786 (1980); Louisell y Williams, [2 *Medical Malpractice* Sec. 22.3, Cap. XXII], pág. 22-13. (Énfasis suplido.)

El primer párrafo transcrito reitera la norma general de negligencia, en cuanto la misma está limitada por la previsibilidad. El segundo, parece adoptar el criterio del profesional médico; aunque lo refiere al médico particular en cuestión, lo cataloga de "razonablemente", por lo que en realidad se refiere al médico promedio conforme la práctica prevaleciente en la comunidad profesional. Con el beneficio de esos pronunciamientos completamos la tarea de determinar la información concreta que el médico debe brindar

en cada caso particular; son necesarios unos criterios adicionales.

Existe poca, si alguna, controversia sobre los elementos del deber de información, es decir, la clase de información que el médico debe comunicar al paciente. En términos generales, el médico debe informar sobre el diagnóstico, la naturaleza de las alternativas de tratamiento (especialmente de aquel propuesto o recomendado por el médico), las probabilidades de éxito del tratamiento, los riesgos y beneficios de éstos, y la prognosis en caso de que la condición diagnosticada no sea tratada. A.J. Rosoff, *Informed Consent: A Guide for Health Care Providers*, Maryland, Aspen Publishers, Inc., 1981, págs. 41–51. Describir en términos generales cuáles han de ser los elementos de divulgación es una tarea simple. Sin embargo, la determinación concreta de la información específica que debe ser divulgada en el contexto de cada supuesto particular es más difícil. Se precisa, pues, la promulgación de criterios que guíen la determinación de la extensión de este deber en cada caso.

■ El criterio ideal para adelantar los valores subyacentes del deber de información —el derecho del paciente a la autodeterminación— es el de la completa y total divulgación. Sin embargo, las necesarias realidades de la práctica de la medicina imponen que la divulgación sea algo menos que completa. En primer lugar, el conocimiento médico puede alcanzar niveles de complejidad que estarían fuera del alcance de una persona no diestra en ese campo, por lo que no podría ser comunicado efectivamente. En segundo lugar, el proceso de divulgar "toda" la información relacionada requeriría que el paciente fuera provisto del equivalente a una educación médica. *Ríos Ruiz v. Mark*, supra.

■ Luego de sopesar los criterios correspondientes, lo más apropiado es que adoptemos el criterio del profesional de la medicina, y no el del paciente razonable establecido

en *Canterbury v. Spence*, supra. Bajo éste, un tratamiento puramente cosmético, como el de la blefaroplastía a que se sometió la señora Sepúlveda de Arrieta, acarrea para el médico el deber de informar aquellos riesgos, conforme lo establecido por la práctica prevaleciente de la medicina. Bajo ninguna circunstancia, ni siquiera en aquellos tratamientos que no entrañen ningún fin curativo, tendrá el médico el deber de informar sobre los riesgos que sean remotos, que hayan ocurrido en pocas ocasiones o que sean meramente hipotéticos.

En el caso de autos, la blefaroplastía tenía propósitos *puramente cosméticos*. Los riesgos de ectropión y de *scleral show*, según el testimonio de los peritos, son complicaciones reconocidas de la blefaroplastía. El propio perito de la parte demandada testificó que estas complicaciones "son las más comunes" y "pueden resultar de una blefaroplastía aún bajo las manos más diestras". La paciente debió haber sido informada de esos riesgos antes de consentir a la operación. El doctor Barreto Domínguez incumplió con su deber. ¿Cuáles son las consecuencias jurídicas de su incumplimiento?

## V

El Art. 1802 del Código Civil, 31 L.P.R.A. sec. 5141, establece que todo perjuicio material o moral da lugar a reparación si concurren tres (3) requisitos o elementos: primero, que se establezca la realidad del daño sufrido; segundo, que exista nexo causal entre el daño y la acción u omisión de otra persona, y tercero, que dicho acto u omisión sea culposo o negligente. *Soc. Gananciales v. G. Padín Co., Inc.*, 117 D.P.R. 94, 106 (1986); *Jiménez v. Pelegrina Espinet*, 112 D.P.R. 700, 703 (1982).[21] Una omisión es antiju

---

[21] "Si bien el consentimiento —en los casos en que es exigible— confiere licitud a la actuación desarrollada por el médico, es necesario aclarar que por sí solo no conduce a una exoneración de responsabilidad profesional del médico ... cuyo deber

rídica cuando el alegado causante del daño incumple un deber jurídico de actuar, y la realización del acto omitido hubiese evitado el daño. *Soc. Gananciales v. G. Padín Co., Inc.*, supra.

En el caso de autos, el doctor Barreto tenía el deber jurídico de adquirir el consentimiento informado de su paciente antes de operarla, esto es, haberle informado del riesgo del ectropión. ¿Existe relación causal entre ese incumplimiento y la ocurrencia o materialización del daño (ectropión)?[22] ¿Qué criterios deben guiarnos en esta deter-

---

es actuar dentro de la más pura deontología, empleando todos sus conocimientos y utilizando la máxima diligencia en el desarrollo de la intervención." Martínez-Calcerrada, *op. cit.*, pág. 102.

Añade Martínez-Calcerrada lo siguiente:

"Sólo la ausencia de daño en el paciente, de una relación de causalidad que una a aquél con el autor del acto médico y de la catalogación de su actuación como dolosa, culposa o debida a impericia, exonerarán al médico de responder civilmente por sus actuaciones." Íd.

Para Ataz López, la inexistencia de consentimiento no engendra automáticamente la responsabilidad del médico, de la misma forma que la existencia del mismo no le libera de responsabilidad civil. El consentimiento no puede considerarse en este sentido como una especie de cláusula de irresponsabilidad del médico. A la inversa: el simple hecho de que un médico emprenda un tratamiento sin el previo consentimiento del paciente, no engendra automáticamente responsabilidad, porque la responsabilidad es la obligación de reparar un daño causado a otro, y puede ocurrir que en estos casos no haya daño sino beneficio. A pesar de ello, Ataz López reconoce la posibilidad de que en estos casos haya un daño moral por el atentado sufrido en la libertad personal. Sin embargo, sugiere que cuando hay un beneficio físico, éste podría compensar el daño moral sufrido, excluyendo la posibilidad de una indemnización por este último. Ataz López, *op. cit.*, págs. 80–82. Fernández Costales coincide, cuando señala:

"A nuestro entender la responsabilidad del médico es clara cuando falta a su deber de información, pues está constituyendo la base de la decisión del enfermo que no puede tomar sin la información necesaria o deformada en su caso, por lo que el facultativo deberá responder siempre aunque haya actuado correctamente con arreglo a las reglas del arte de su profesión, *si el paciente puede demostrar que no se hubiera visto dañado en su integridad corporal si el médico se hubiera abstenido de realizar la intervención correspondiente.*" (Énfasis suplido.) J. Fernández Costales, *La Responsabilidad civil médica y hospitalaria*, Madrid, Ed. La Ley, 1987, pág. 130.

[22] El fundamento jurídico para imponer responsabilidad civil a un médico que opera sin el consentimiento del paciente es el concepto de culpa subsumido en el Art. 1802 de nuestro Código Civil, 31 L.P.R.A. sec. 5141. *Rojas v. Maldonado*, 68 D.P.R. 818, 826 (1948); H.M. Brau Del Toro y R.A. Marcial Rojas, *La doctrina del consentimiento ilustrado para tratamiento médico*, 54 (Núm. 1) Rev. Jur. U.P.R. 113, 154 (1985).

Por el contrario, en situaciones como la del caso de autos, donde existe una ausencia de consentimiento informado, el fundamento jurídico para imponer responsabilidad es la institución de la negligencia. Brau Del Toro y Marcial Rojas, *op. cit.* Esta última surge por la violación no intencional del derecho del paciente a recibir

minación? Nuevamente hagamos un breve recorrido por otras jurisdicciones.

■ En Estados Unidos, al igual que en la doctrina civilista moderna, el mero incumplimiento del deber de informar al paciente no es suficiente para constituir una obligación del médico de resarcir daños. Dos (2) condiciones deben, además, cumplirse: (1) que el paciente haya sufrido un daño y (2) que sea causado por el incumplimiento del médico de su deber de informar. Rosoff, *op. cit.*, pág. 52; Lidz, *Informed Consent*, Nueva York, Guilford, 1984, págs. 14–15; Furrow, *Health Law*, Minnesota, West Publishing Co., 1987, pág. 249. En otras palabras, debe ocurrir un daño y haber relación causal con la negligencia del médico. En esto coinciden con la doctrina científica. Difieren, sin embargo, en cuanto a la teoría de causalidad aplicada.

■ En la jurisprudencia angloamericana la norma de causalidad imperante es la de la "causa próxima". Según ésta ha sido aplicada a casos de impericia médica por falta de consentimiento informado, la falta de información debe haber sido determinante en la decisión del paciente de consentir al procedimiento médico. Se han utilizado dos (2) criterios para determinar la relación causal. El criterio mayoritario es el llamado "criterio objetivo" (esbozado en *Canterbury v. Spence*, supra), en el cual el demandante debe probar que una persona razonable, debidamente informada, colocada en la posición del paciente, habría rechazado el tratamiento propuesto por el médico. Ver N.Y. Pub. Health Law Sec. 2805-d(3) (McKinney 1977); *Hartke v. McKelway*, 707 F.2d 1544 (Cir. D.C. 1983); *Hook v. Rothstein*, 316 S.E.2d 690 (1984). Bajo el criterio "subjetivo", el demandante tiene que establecer que personalmente no habría consentido, de haber estado adecuadamente informado. Ver Alaska Stat. Sec.

---

información sobre el procedimiento médico propuesto para su cuerpo. *Rojas v. Maldonado*, supra, pág. 825.

09.55.556(a) (1983). Algunas jurisdicciones exigen que tanto el criterio subjetivo como el objetivo sean cumplidos. Ver *Harnish v. Children's Hosp. Med. Center.*

▆ Ambos criterios presentan inconvenientes. El subjetivo se presta para que el paciente cuestione retrospectivamente la situación (*second guessing*). Bajo este criterio, se ata la determinación fáctica de causalidad a la apreciación judicial de la credibilidad del paciente. Esto resulta problemático porque coloca al médico a merced de la arbitraria apreciación a posteriori del paciente, mientras que se sitúa al juzgador de los hechos en la difícil posición de tener que decidir si la contestación especulativa del paciente a una pregunta hipotética merece ser creída.

El criterio objetivo, por su parte, tampoco está libre de inconvenientes. En la medida en que subordina la libertad individual de autodeterminación corporal a la decisión objetiva del paciente prudente y razonable —según determinada ésta por el juzgador— da al traste con el objetivo principal del requisito de divulgación: conservar y proteger el derecho del paciente a ser él quien decida sobre su cuerpo, asunto sobre el cual debe estar en libertad por las razones que mejor le parezcan a él (no las que moverían a un paciente promedio).

. Ambos modelos se fundan en la creencia de que la relación causal entre el incumplimiento del deber de informar y la decisión del paciente de consentir al procedimiento o tratamiento médico propuesto es un asunto sobre el cual los tribunales podemos hacer unas determinaciones coherentes y confiables. Obliga a adentrarse en el proceso decisorio del paciente. Además, supone que el derecho a la autodeterminación corporal tiene poco o ningún valor en sí mismo (desligado del daño sufrido en los supuestos en que se materializa un riesgo no divulgado).

En su concepción generalizada, la cadena causal entre la omisión del médico y la materialización del riesgo no divulgado tiene dos (2) eslabones: (1) la falta de divulga-

ción debe haber "causado" que el paciente consintiera al tratamiento o procedimiento propuesto, y (2) el tratamiento o procedimiento debe haber causado daño al paciente. El segundo busca determinar la causalidad material entre la intervención médica y la ocurrencia o materialización del riesgo no divulgado. Aunque esta determinación también presenta dificultades, es el tipo de determinación que se ve a diario en acciones de daños y perjuicios y para las cuales los tribunales están debidamente preparados. El primer eslabón, sin embargo, presenta para el tribunal unos problemas cuyas soluciones están fuera de su alcance. Exige hacer una determinación de causalidad volitiva, o relación causal entre un hecho objetivo (la falta de información) y la decisión subjetiva de consentir al acto médico. Los factores que pueden entrar en juego en el proceso de decisión humano son innumerables. Esto dificulta la tarea de predecir el producto de dicho proceso de análisis de información.

El criterio objetivo esbozado en *Canterbury v. Spence*, supra, presenta unos problemas adicionales. *Primero*, impide el resarcimiento a aquel paciente que en efecto se hubiera negado a consentir a un procedimiento al cual un paciente razonable habría consentido. *Segundo*, limita el campo de operación de la doctrina de consentimiento informado a aquellos supuestos en que un paciente razonable no consentiría a un procedimiento o tratamiento cuya proposición por parte del médico era también razonable (recordemos que en los casos estrictamente de consentimiento informado no media negligencia en la recomendación —ni ejecución— del tratamiento o procedimiento médico). Y *tercero*, descansa sobre la premisa debatible de que el tribunal puede determinar con suficiente grado de certeza lo que un paciente razonable, debidamente informado, decidiría de encontrarse en la coyuntura del paciente concreto.

Indudablemente el modelo americano requiere que el tribunal se adentre en las impredecibles complejidades del

proceso decisional humano. A.D. Twerski y N.B. Cohen, *Informed Decision Making and the Law of Torts: The Myth of Justiciable Causation*, 1988 (Núm. 3) U. Ill. L. Rev. 607. Además, pasa por alto la razón de ser del deber de informar —derecho de todo ser humano a la autodeterminación corporal— y concentra su atención en el daño físico sufrido. Esta privación es de por sí un daño moral que merece una compensación independientemente del resultado material a que pueda dar lugar.

Contrario al modelo americano —que centra su atención en el proceso decisional del sujeto agraviado, ya de forma objetiva o subjetiva— la doctrina civilista lo hace sobre el presunto agravante. Para ésta, el acto omisivo puede merecer, desde el punto de vista jurídico, el concepto de "causa" del daño. Para ello se requiere: (1) que con verosimilitud rayana en seguridad se hubiera evitado el daño de haberse realizado la acción omitida; (2) que para evitar el resultado hubiese un deber jurídico de obrar. J. Santos Briz, *La responsabilidad civil: derecho sustantivo y derecho procesal*, Madrid, Ed. Montecorvo, 1991, Vol. I, págs. 243–244.

Para Santos Briz, el problema más importante que presenta la doctrina de la adecuación es el de la extensión de la responsabilidad. Debe llegar hasta donde el curso causal pueda ser dirigido y dominado por la voluntad. Únicamente podrá decirse que se domina por la voluntad esa evolución causal cuando la misma es *previsible*. "La previsibilidad, dice Cantzler, es la frontera extrema de la posibilidad de dominación o control, y con ello también de la responsabilidad de un hombre por un hecho; es decir, que sólo puede serle imputado el curso causal de los hechos en cuanto sea previsible. En la adecuación no se trata, pues, de un problema causal puro, sino de la relación del sujeto con la evolución causal." Santos Briz, *op. cit.*, págs. 239–241. Por lo tanto, conforme con la doctrina citada, el análisis de causalidad en el sistema civilista no se hace

desde el punto de vista de lo que habría hecho el paciente de haber tenido información adicional, sino de lo que le era exigible prever al médico como consecuencia normal de su omisión.

■ En Puerto Rico rige la doctrina de la "causalidad adecuada" para determinar la causalidad legal entre la acción u omisión negligente y el daño sufrido. *Soc. de Gananciales v. Jerónimo Corp.*, 103 D.P.R. 127 (1974).[23] Conforme con esta doctrina, no es causa toda condición sin la cual no se hubiera producido el resultado, sino aquella que ordinariamente lo produce, según la experiencia general. A su amparo, la cuestión a resolver consiste en determinar si la materialización del daño era de esperarse en el curso normal de los acontecimientos o si, por el contrario, queda fuera de ese posible cálculo. M. Albaladejo, *Comentarios al Código Civil y compilaciones forales*, Madrid, Ed. Edersa, 1984, T. XXIV, pág. 267.

■ Aplicada al caso de autos, la cuestión a resolver consiste, entonces, en determinar si en el curso normal de los acontecimientos, le era exigible al doctor Barreto Domínguez prever que la falta de la información debida llevaría a la paciente Sepúlveda de Arrieta a adoptar una decisión distinta de la que habría tomado de haber estado adecuadamente informada. En otras palabras, no es necesario determinar si ella, como paciente —subjetiva u objetivamente— habría consentido o no al acto médico pro-

---

[23] En un caso anterior el Tribunal ha dicho, en *dictum*, que cuando un demandante reclame responsabilidad civil de un médico por falta del consentimiento informado, tiene que establecer, en conformidad con los principios generales de negligencia, que la falta de información adecuada fue la *causa próxima* del daño resultante. *Rodríguez Crespo v. Hernández*, 121 D.P.R. 639, 665–666 (1988).

Sin embargo, nuestra jurisprudencia de los últimos años establece firmemente que en Puerto Rico rige la doctrina de la *causalidad adecuada* para determinar la existencia de un nexo causal o causalidad legal entre la negligencia y el daño. *Soc. Gananciales v. G. Padín Co., Inc.*, 117 D.P.R. 94 (1986); *Jiménez v. Pelegrina Espinet*, 112 D.P.R. 700 (1982); *Soc. de Gananciales v. Jerónimo Corp.*, supra. Véanse, también. *Díaz v. E.L.A.*, 118 D.P.R. 395, 420–423 (1987), opinión disidente del Juez Asociado Señor Rebollo López; *Román v. E.L.A.*, 116 D.P.R. 712, 715–717 (1985), opinión disidente del Juez Asociado Señor Negrón García.

puesto, sino si le era exigible al doctor Barreto Domínguez prever que la falta de información debida llevaría al paciente a exponerse a los riesgos no divulgados. Bajo este prisma, es obvio que en el curso normal de los acontecimientos un cirujano debe prever que guardar silencio sobre un riesgo, que *además de ser común* en el procedimiento propuesto *produce un efecto desfigurante*, a un paciente que desea someterse a una cirugía cosmética selectiva, sin ningún valor terapéutico, llevaría muy probablemente al paciente a adoptar una decisión distinta de la que habría tomado de estar debidamente informado. No es necesario que el médico haya hecho esta determinación con certeza matemática. Basta que su negligencia haya sido la que, en el curso normal de los acontecimientos, con mayor probabilidad pueda ocasionar el daño, para que a éste le sea exigible previsión y sea obligado a cumplir con el imperativo del Art. 1802 de nuestro Código Civil, *supra*.

Resulta, innecesario por lo tanto, recurrir a los criterios que ofrece la jurisprudencia de Estados Unidos. La doctrina civilista de causalidad adecuada atemperada con la regla de la previsibilidad nos permite llegar a una solución justiciera.

*Se dictará sentencia y revocará la del Tribunal Superior, Sala de San Juan. Se declara con lugar la demanda. El foro de instancia determinará la cuantía de los daños por la violación al derecho de autodeterminación corporal y la materialización u ocurrencia del riesgo no divulgado.*

Los Jueces Asociados Señores Rebollo López y Fuster Berlingeri concurrieron con el resultado sin opiniones escritas. La Juez Asociada Señora Naveira de Rodón no intervino.