# 2001 DTA 162

**TRIBUNAL DE CIRCUITO DE APELACIONES**
**CIRCUITO REGIONAL DE SAN JUAN**

JUAN REYES FLORES
Demandante-Apelante

v.

UNIVERSIDAD DE PUERTO RICO, HOSPITAL UNIVERSITARIO DE PUERTO RICO, ESTADO LIBRE ASOCIADO DE PUERTO RICO, ADMINISTRACION DE FONDO DE COMPENSACION AL PACIENTE, PROFESSIONAL UNDERWRITERS INSURANCE COMPANY, CORPORACION INSULAR DE SEGUROS, XYZ Y MNO INSURANCE COMPANIES, JOHN DOE Y JANE DOE
Demandados-Apelados

Núm. KLAN-00-00724

San Juan, Puerto Rico, a 1 de mayo de 2001

Panel integrado por su Presidenta, la Juez Alfonso de Cumpiano,
el Juez Aponte Jiménez y la Juez Feliciano Acevedo

Alfonso de Cumpiano, Jueza Ponente

## TEXTO COMPLETO DE LA SENTENCIA

El apelante, Sr. Juan Reyes Flores, presenta recurso de apelación en solicitud de la revocación de la sentencia del Tribunal de Primera Instancia, Sala Superior de San Juan, declarando sin lugar la demanda de daños y perjuicios por impericia médica que presentó contra la Universidad de Puerto Rico, el Hospital Universitario y sus compañías aseguradoras (los apelados). En esencia, alega que erró el tribunal al declarar sin lugar las mociones de determinaciones de hechos adicionales y de reconsideración, al determinar que no constituyó un acto de impericia médica el no realizar la prueba de niveles del medicamento Dilantin, al determinar que no se violó la doctrina de consentimiento informado y al dictar una sentencia que no representa el balance más racional, justiciero y jurídico de la evidencia.

Examinados los planteamientos de las partes a la luz del expediente y del derecho aplicable, procede confirmar la sentencia apelada.

### I

Los hechos relevantes, conforme el expediente, revelan que el 5 de junio de 1985, el Sr. Juan Reyes Flores, entonces de diecinueve (19) años de edad, fue víctima de un accidente al ser impactado por un vehículo de motor mientras conducía en bicicleta por la carretera número 156. Se le atendió brevemente en el Centro de Salud de Aguas Buenas, donde se le suturó una herida en el cuero cabelludo y se le administró una inyección anti-tetánica. Luego, fue referido al Hospital de Caguas. Allí se determinó que tenía una fractura lineal, en la región occipital izquierda del cráneo. Para prevenir y evitar hinchazón en el cerebro, se le administraron 40 miligramos de Decadrón. Finalmente, el 6 de junio de 1985, el señor Reyes Flores fue trasladado al Hospital Universitario en el Centro Médico. Luego de una evaluación física, se le prescribieron los medicamentos Tigan, Tagamet y Decadrón intravenoso. Además, se solicitó una consulta al Departamento de Neurocirugía, ya que sufría de fuertes dolores de cabeza.

En el Departamento de Neurocirugía el apelante fue evaluado por un residente que encontró que estaba alerta, atento, con pupilas iguales y reactivas, con movimientos extraoculares normales, la lengua en el medio y sin flujo nasal o aural. Debido a que continuaba sufriendo de fuertes dolores de cabeza y vómitos, se ordenó una

tomografía computarizada de la cabeza (CT Scan). Esta reveló varias hemorragias focales como resultado de la contusión y fractura lineal. Ante ello, el Dr. Aloysius Llaguno ordenó la administración de cuatro dosis iniciales de 250 miligramos de Dilantin, un anticonvulsivo y de 100 miligramos a ser administrados cada ocho (8) horas. Posteriormente, el apelante fue dado de alta del Hospital Universitario con una hoja de instrucciones sobre los síntomas que debía observar.

El señor Reyes Flores fue a la visita de seguimiento en la cual fue sometido a un examen neurológico. Los resultados no dieron indicaciones de toxicidad. Se le citó para una fecha posterior. Según estipulado por las partes, en esta visita se le ordenó que continuara tomando Dilantín.

El 3 de julio de 1985, el señor Reyes Flores comenzó a sentir molestia en la garganta y los ojos. Tomó un medicamento para aliviar el dolor de garganta y utilizó gotas de ojos, pero no aliviaron sus síntomas. Esa noche, la pasó con fiebre, la condición de los ojos le empeoró y comenzó a presentar lesiones en la piel y la mucosa bucal. Al día siguiente, fue llevado a la Sala de Emergencia del Centro Médico con fuertes dolores de cabeza, labios pelados, lesiones en la mucosa bucal, máculas y erosiones en el cuerpo y lesiones de cuatro a doce centímetros en el tronco del cuerpo. Además se le cerraron los ojos, la boca y la nariz. Fue trasladado a medicina interna, donde llegó inconsciente. Desarrolló convulsiones y fue transferido a la Unidad de Cuidado Intensivo. Sufrió condiciones de cuidado que requirieron, entre otros tratamientos, oxígeno, tubo nasogástrico, ventilador, Demerol para el dolor e implantes de piel. Al ser dado de alta, continuó con el tubo nasogástrico y con dificultad para caminar.

Del récord médico surge que el apelante estaba sufriendo del síndrome Steven Johnson o eritema multiforme. Este síndrome es una reacción de hipersensibilidad que puede ser ocasionada por infecciones virales o bacterianas, por ciertos alimentos o por una variedad de medicamentos.

Como consecuencia del Steven Johnson, el apelante quedó afectado en su visión, tuvo que practicársele una circuncisión, se afectaron sus estudios y sufrió emocionalmente.

El 9 de octubre de 1987, el señor Reyes Flores presentó la demanda de daños y perjuicios objeto de este recurso. Imputó a los demandados actos y omisiones negligentes que se apartaron de lo generalmente aceptado por la profesión médica en la administración del medicamento Dilantín y en la falta de información sobre sus posibles efectos.

Durante el curso de los procedimientos, las partes hicieron amplio uso de los métodos de descubrimiento de prueba y llegaron a estipulaciones de hechos de los récords médicos. En las varias vistas en su fondo celebradas, medió prueba testifical, pericial y documental. Luego de numerosos incidentes procesales, el tribunal dictó la sentencia apelada el 7 de abril de 2000.

El tribunal incluyó determinaciones de hechos y conclusiones de derecho, conforme a los cuales resolvió que el tratamiento con Dilantín en este caso era indicado y que el riesgo de desarrollar el síndrome Steven Johnson no era razonablemente previsible. Dictaminó que bajo la doctrina de consentimiento informado, un médico no es responsable por no divulgar riesgos que razonablemente no puede prever o que son remotos. Declaró sin lugar la demanda e impuso a la parte demandante el pago de costas.

Procedemos al examen de los planteamientos del recurso.

## II

Los errores planteados por el apelante sobre la denegatoria de las mociones de determinaciones de hechos adicionales y de reconsideración, así como en cuanto al balance justiciero y jurídico de la prueba, se refieren básicamente a la apreciación de la prueba por el tribunal. Es pertinente, por tanto, exponer las normas bajo las cuales evaluamos esa función judicial del foro apelado.

Es principio reconocido que las determinaciones de hechos de los tribunales de primera instancia basadas en testimonio oral, no se dejarán sin efecto a menos que sean claramente erróneas. Nuestro Tribunal Supremo ha reiterado que no debemos intervenir con las determinaciones de hechos que hace un tribunal sustituyendo con nuestro criterio el del juzgador ante quien declararon los testigos y quien tuvo la oportunidad de escuchar sus declaraciones y observar la forma en que presentaron sus testimonios. Es por ello que la apreciación de la prueba efectuada por el tribunal apelado merece gran deferencia. Esta norma cede cuando existen en el caso o en la determinación circunstancias extraordinarias o indicios de pasión, prejuicio, parcialidad o error manifiesto. A menos que uno de estos factores se encuentre presente, no se intervendrá en apelación con los hechos determinados por el juzgador de primera instancia. *Rolón García v. Charlie Car Rental*, 148 D.P.R. __ (1999), **99 J.T.S. 89**, pág. 1091; *Huertas v. Fomento Recreativo*, 146 D.P.R. __ (1998), **98 J.T.S. 144**, pág. 254; *López Vicil v. ITT*, 142 D.P.R. __ (1997), **97 J.T.S. 42**, pág. 833; *Sánchez Rodríguez v. López Jiménez*, 116 D.P.R. 172, 181 (1985).

Los hechos que un tribunal entiende probados, los hace constar en las determinaciones de su sentencia, las que deben estar debidamente sustentadas por la evidencia presentada. La procedencia o no de una moción de determinaciones de hechos adicionales depende del criterio del juzgador, conforme lo que quede probado y sea relevante para la decisión. Regla 43 de las de Procedimiento Civil, 32 L.P.R.A. Ap. III; *Blas, et al. v. Hospital Nuestra Señora de la Guadalupe*, et al., 146 D.P.R. __ (1998), **98 J.T.S. 101**, pág. 1410.

En cuanto a la evaluación de prueba pericial o documental, la norma prevaleciente establece que los tribunales apelativos están en igual posición que los foros de primera instancia para evaluarla y llegar a sus propias conclusiones. *Cruz v. Centro Médico*, 113 D.P.R. 719 (1983). Hay amplia discreción para evaluar prueba pericial pudiendo el tribunal apelativo adoptar su propio criterio y aun descartarla. *Dye-Tex Puerto Rico, Inc. v. Royal Insurance Co. of P.R. Inc.*, 150 D.P.R. __ (2000), **2000 J.T.S. 67**, pág. 931.

Aparte de la amplia prueba documental que consta en el expediente, incluyendo los expedientes médicos del apelante que consideró el tribunal al emitir su dictamen, éste tomó en cuenta la prueba oral desfilada en las vistas. Para su examen, contamos con la exposición narrativa de los testimonios sometidos por el apelante en moción del 30 de octubre de 2000 y las objeciones de los apelados en moción de 31 de octubre de 2000. El resumen de los testimonios en lo relevante, brinda las bases para el análisis de los planteamientos en torno a la prueba.

## A

Por el apelante, prestaron testimonios la Sra. Norma Iris Flores, el Sr. Juan Reyes Flores, el Sr. Juan Reyes Merced y la Sra. Luz Haydeé Flores.

El Sr. Juan Reyes Flores hizo un recuento de los hechos ocurridos con motivo del accidente de tránsito y de su tratamiento médico. Declaró que lo que recordaba hasta llegar al Centro Médico eran dolores de cabeza; le dieron pastillas para el dolor de cabeza; se sintió consciente en el Centro Médico, cuando le dieron el medicamento por vena. No recordaba lo que sucedió en el Hospital San Rafael. Señaló que una vez en el Centro Médico, una enfermera le inyectó un medicamento que le ardía. En ese momento nadie le explicó qué medicamento le iban a poner, ni porqué; posteriormente le dijeron que el medicamento era Dilantín. Continuó tomando el Dilantín después de ser dado de alta, tres veces al día porque ésas fueron las instrucciones del médico. Ningún médico le explicó sobre los posibles efectos secundarios de ese medicamento. En su visita de seguimiento, le dijo al médico que se sentía mal porque estaba sudando muchísimo, fuera de lo normal y que estaba perdiendo peso. También le dijo que tenía los ojos un poco ardientes, que sentía molestia y que tenía fiebre. El 3 de julio de 1985, se dio cuenta de que no podía comer y le salieron unas bolitas rojas debajo del párpado, luego amaneció con unas pelotas bien duras en los ojos y las pestañas le amanecieron pegadas, se le cerraron la boca, la nariz y los ojos y sintió que sus órganos, su pene y sus testículos estaban grandes, se le pegaron los muslos, se hinchó todo y se desfiguró por completo. Declaró que aparte de Dilantín, no tomó ningún medicamento después del 8 de junio de 1985. Declaró además sobre su proceso de recuperación y los

daños que le causó la enfermedad.

La madre del apelante, Sra. Norma Iris Flores, declaró que fue informada en el Hospital Regional de Caguas, donde fue llevado su hijo luego del accidente, que tenía una fractura en la cabeza. Describió las incidencias en el Centro Médico. Señaló que en el Centro Médico, el 7 de junio de 1985, se le practicó un CT Scan al apelante. El doctor Llaguno le dijo que el apelante tenía algo en el cerebro, una fractura, pero que era como una nalgadita que se marca, pero no pasa de ahí. Expresó que el 7 de junio de 1985, al día siguiente de haber sido admitido al Centro Médico, una enfermera le inyectó al apelante un medicamento con jeringuilla. Indicó que luego se enteró que el medicamento era Dilantín. Señaló que eso fue lo que el doctor Llaguno le recetó para continuar el tratamiento en su casa. Añadió que nadie le explicó a ella qué medicamento le estaban administrando al apelante, ni por qué razón, ni le hicieron advertencias. Dijo que al dar de alta a su hijo, el médico le dijo que el medicamento no era necesario; no obstante, le entregó una receta. En la visita de seguimiento, tampoco le explicaron sobre el tratamiento de Dilantín, ni sobre los efectos secundarios, ni de la prueba de niveles de Dilantín. Describió los síntomas que observó en su hijo el 3 de julio de 1985. Indicó que ellos (el personal médico del Hospital Universitario), negaron siempre que el síndrome Steven Johnson fue a consecuencia del Dilantín.

El Sr. Juan F. Reyes Merced, padre del apelante, testificó que el 8 de junio de 1985 fue a recoger a su hijo al Centro Médico, luego de haber sido dado de alta. Recibió y firmó un documento titulado Instrucciones al Paciente Después de Recibir Tratamiento en la Sala de Emergencia. Nadie le dio explicación sobre el contenido del documento, ni sobre el Dilantín que estaba tomando su hijo, ni por qué se lo administraron, las posibles reacciones secundarias, ni las reacciones que debía vigilar en relación con la medicina.

La Sra. Luz Haydee Flores, tía del apelante, testificó que durante la segunda hospitalización firmó un Consentimiento Especial para Operación u Otro Tratamiento con autorización de la familia, para que pudieran anestesiar al apelante para removerle la piel muerta y otro para anestesiarlo para ponerle la piel artificial.

Como testigos periciales, el apelante presentó al Dr. Modesto Fontánez González, especialista en el campo de neurocirugía y al Dr. Walter Kleis, perito en el campo de oftalmología. Los apelados presentaron como peritos al Dr. Angel González Cotto, especialista en el campo de la neurología y a la Dra. Luz D. Figueroa, especialista en el campo de dermatología.

El doctor Fontánez declaró sobre la diferencia entre la neurocirugía y la neurología y sobre sus cualificaciones profesionales. Testificó que la documentación que tuvo a su disposición para formular su opinión sobre la condición de Juan Reyes Flores, fue copia del expediente donde obra una hoja de evaluación del Centro de Salud Médica de Aguas Buenas, del Hospital Regional de Caguas y de la Sala de Emergencia del Centro Médico, información de la hospitalización en el Departamento de Neurocirugía del Hospital Universitario, récord de la visita de seguimiento y el expediente de una hospitalización posterior por otra condición. A base de esto, determinó que el apelante sufrió una fractura lineal del cráneo acompañada con dolores de cabeza que mejoraron durante el período de observación; no hay evidencia de que el paciente tuvo pérdida de conocimiento. El CT Scan practicado al paciente reveló que había hemorragias superficiales en la región frontal derecha del cerebro, pero no había efecto de volumen de masa o desplazamiento de las estructuras internas que indicaran daño cerebral severo. En la Sala de Emergencia, se le suministró el anti-inflamatorio conocido como Decadrón. Al ser ingresado la Unidad de Neurocirugía, se le suministró Dilantín y Tylenol. No encontró evidencia en el récord de que se le haya informado al paciente o sus familiares sobre la condición médica del señor Reyes Flores, ni sobre el tratamiento de Dilantín o las alternativas a éste. Opinó que no había justificación para darle Dilantín, ya que no había perdido el conocimiento. Expresó que quizás se le suministró para evitar una convulsión. En su opinión, era la obligación del doctor explicarle al paciente y a sus familiares los riesgos de tomar el medicamento y la propensidad a desarrollar alguna convulsión como secuela del trauma, pero que en su caso, este riesgo era mínimo, de uno o dos por ciento. Hizo referencia a literatura médica respecto a que el Dilantín, dado específicamente como profilaxis para las convulsiones después de un

traumatismo craneal, no hacía diferencia significativa en términos del desarrollo de convulsiones.

Declaró que entre administrar o no el Dilantín, era el paciente a quien le correspondía tomar la decisión de cuál alternativa escoger. Según su opinión, el formulario de consentimiento para admisión y tratamiento no cumplía con las exigencias de la profesión sobre consentimiento informado.

El doctor Fontánez señaló, por otro lado, que la prueba de los niveles de Dilantín determina si el nivel del medicamento en la sangre es el apropiado para el uso que se le está dando. Añadió que le debieron haber hecho la prueba de niveles de Dilantín a Juan Reyes Flores para saber si la cantidad que se le estaba administrando, versus la cantidad que estaba en la sangre, era adecuada para lograr el efecto deseado. Declaró que el no haber hecho esta prueba, es una desviación del standard de manejo de un paciente y no cumple con las exigencias de la profesión médica.

Manifestó el doctor Fontánez que al continuar con el Dilantín después de la visita de seguimiento, el médico debió haberle advertido al paciente sobre algún tipo de reacción, ya sea fiebre, erupción en la piel, desbalance, temblores en las extremidades o síntomas de toxicidad o alergia. No obstante, admitió que por simplemente estar en contacto con el medicamento, el paciente corre el riesgo de tener una reacción de hipersensibilidad, lo que no tiene nada que ver con la cantidad que pueda tener en la sangre. Estas manifestaciones de hipersensibilidad, de acuerdo al perito, se catalogan como el síndrome Steven Johnson. Explicó que hay un sinnúmero de medicamentos que pueden causar esta reacción o también puede causarla una infección bacterial o viral. Dijo que el Dilantín es más notorio en ese aspecto, o sea, que hay más casos reportados de esta reacción por Dilantín que por otros medicamentos como el Tylenol, el cual también fue administrado al paciente.

Testificó que desconoce cuál es el por ciento de pacientes que utilizando Dilantín desarrollan el síndrome Steven Johnson. Dijo que del récord de la segunda hospitalización, surge que el diagnóstico fue que el síndrome aparentaba estar relacionado con el Dilantín recibido. Señaló que en la hoja de la Sala de Emergencia dice también que quizás está relacionado con el virus que sufrió previo a la admisión.

El segundo perito presentado por el apelante fue el Dr. Walter Kleis. Comenzó su testimonio declarando sobre su capacidad y cualificaciones en la rama de oftalmología. Declaró que entre los medicamentos más comúnmente asociados con el Steven Johnson, están Sulfa, Penicilina y Dilantín, pero señaló que hay una lista larga de medicamentos que pueden causarlo, incluyendo el Tylenol. Añadió que en base al expediente suministrado por ACAA en cuanto a la condición del apelante, la misma se debió al Dilantín.

El testimonio del doctor Fontánez fue contrarrestado por el perito de los apelados, el neurólogo Dr. Angel González Cotto. Este expuso su preparación como neurólogo y sus cualificaciones como perito. Declaró que en una hoja del récord del Hospital de Caguas se menciona que el paciente había desarrollado vómitos y que tuvo un traumatismo craneal occipital y una fractura lineal en la región occipital. Mencionó que una vez en el Centro Médico, el señor Reyes Flores fue evaluado por un neurocirujano que le ordenó un CT Scan. Este demostró varias hemorragias bucales envolviendo el lóbulo frontal derecho, secundario a la contusión cerebral sufrida y a la fractura lineal. Declaró que el significado de los focos hemorrágicos es, en primer lugar, el área donde están localizados, que los lóbulos frontales son una parte anatómica bien importante que tiene que ver con la función cognocitiva en el cerebro, afectando la corteza que es la parte más importante de esa función. En la corteza hay acumulada sangre que contiene hierro que es una de las sustancias que más puede excitar a una neurona y hacer que se tenga una función anormal. Se trata de actividad eléctrica. Una neurona, en esta condición, puede disparar y producir un foco epiloctogénico, que significa que el paciente puede desarrollar convulsiones y hasta morirse por una convulsión. Está en desacuerdo con el doctor Fontánez en cuanto a que la posibilidad de que el señor Reyes Flores desarrollara convulsiones post-traumáticas, era solamente de uno a dos por ciento. Citó varios estudios de los que surge que las cifras de posibilidad varían, dependiendo del investigador. Aún así, añadió que un dos por ciento es algo que se debe evitar. Citó un artículo del 1990 que trata sobre la utilización

de Dilantín en la prevención de convulsiones post-traumática. En éste se establecen criterios de severidad de traumatismo, uno de los cuales es que se demuestren contusiones corticales visibles por el CT Scan. Las oportunidades de tener convulsiones entre pacientes que reúnan cualquiera de estos criterios, es de veinte por ciento (20%). Presentado con este diagnóstico, el doctor González indicó está de acuerdo con el tratamiento profiláctico de Dilantín. Añadió que este tratamiento se sigue utilizando hoy en día. Expresó que de todos los anticonvulsivos, el Dilantín es el que más frecuentemente se utiliza. Aparte de ello, está entre los primeros treinta (30) medicamentos que se prescriben en la nación americana.

En cuanto a la prueba de niveles de Dilantín, el doctor González manifestó que está indicado hacer esta prueba cuando se sospecha que los niveles del medicamento están por debajo de lo normal, se sospecha toxicidad, se necesita hacer un ajuste y se sospechan otros efectos secundarios del medicamento. Añadió que el señor Reyes Flores, en su visita seguimiento, después de haber sido sometido a varios exámenes neurológicos, no mostró signos de toxicidad de Dilantín y tampoco hubo evidencia de que hubiese convulsado en este tiempo, por lo que entiende que el tratamiento fue adecuado. Señaló que ni las sudoraciones, ni rebajar de peso son síntomas de intoxicación con Dilantín.

Declaró que el mero hecho de que el paciente esté expuesto al Dilantín, lo expone a una reacción de hipersensibilidad. Señaló que no existe ninguna prueba o estudio que pueda determinar si una persona puede desarrollar hipersensibilidad al Dilantín. Explicó que el Steven Johnson es un cuadro de hipersensibilidad que puede ser secundario a diferentes cosas como bacterias, víruses, y diferentes sustancias médicas y no médicas. Además señaló que de acuerdo al expediente médico, el diagnóstico final del apelante fue Steven Johnson, pero no se estableció la causa.

Finalmente, el doctor González declaró que la posibilidad de desarrollar el síndrome Steven Johnson, era de menos de uno en un millón de casos.

Los apelados también presentaron como perito a la Dra. Luz T. Figueroa. Esta comenzó su testimonio estableciendo su historial académico y sus cualificaciones como dermatóloga y perito. Testificó que vio al señor Reyes Flores al día siguiente de haber sido admitido por segunda vez al hospital. Señaló que el paciente presentaba una condición moderada de Steven Johnson, la cual definió como una reacción de hipersensibilidad. Estableció que se desconoce la causa de este síndrome, ya que hay montones de agentes etiológicos que se han implicado, pero nunca probado, que pueden causar Steven Johnson; entre ellos hay víruses, infecciones virales del tracto respiratorio, bacterias, tuberculosis, drogas y ciertos alimentos. La condición es sumamente rara, la incidencia es de mucho menos de uno en un millón de personas si se toman en cuenta todas las posibles causas. La causa por droga es mucho menos del uno por ciento (1%).

La doctora Figueroa señaló que en la visita de seguimiento, el apelante no tenía síntomas de Steven Johnson, ya que sudoración excesiva y pérdida de peso no son el pródromo de este síndrome. Añadió que la prueba de niveles de Dilantín no tiene nada que ver con el desarrollo del síndrome, ya que hasta una pequeña gotita del agente puede precipitar el Steven Johnson. Finalmente explicó que la razón por la cual en el récord médico se estableció que el Dilantín era la causa del síndrome, fue porque la evaluación del paciente la hizo un interno que parece que era recién graduado, porque cita esta causa, pero también dice que podía ser alguna infección viral del tracto respiratorio.

**B**

A los fines de determinar si la prueba presentada fue suficiente para establecer la impericia médica, es necesario examinar las normas de derecho respecto a la responsabilidad por daños en casos de esta naturaleza. Como norma general, el artículo 1802 del Código Civil, 31 L.P.R.A. sec. 5141, establece que será responsable civilmente el que mediante un acto u omisión culposo o negligente cause daño a otro. Para que se configure una causa de acción bajo este artículo, tiene que existir un acto u omisión negligente o culposo, que cause un daño real y efectivo y que exista un nexo causal entre el daño sufrido y la conducta culposa o negligente. *Vega v. A.E.*

*E.,* 149 D.P.R. __ (1999), **99 J.T.S. 145**, pág. 57; *Montalvo v. Cruz,* 144 D.P.R. __ (1998), **98 J.T.S. 6**, pág. ·495.

En Puerto Rico rige la doctrina de causalidad adecuada, la que establece que sólo es causa aquélla que de acuerdo a la experiencia general, ordinariamente produce un resultado. Es decir, no es suficiente que un hecho aparente ser condición de un evento si este hecho no trae consigo regularmente el mismo resultado. *Soto Cabral v. E.L.A.,* 138 D.P.R. 27 (1995); *Toro v. E.L.A.,* 142 D.P.R. 40 (1997). Está establecido que un daño es el resultado natural de un acto negligente si después del suceso, y mirando retroactivamente, el daño aparece como consecuencia regular o razonable del alegado acto negligente. *Torres Trumbull v. Pesquera,* 97 D.P.R. 338 (1969). La cuestión a resolver es si el daño era de esperarse en el curso natural de los eventos. J. Santos Briz, *Comentarios al Código Civil y Compilaciones Forales,* Madrid, Ed. Rev. Der. Privado 1984, XXIV, pág. 267.

La norma mínima de cuidado médico exigible en casos de impericia médica, establece que un médico debe ofrecer a su paciente aquella atención que conforme al estado de conocimiento de la ciencia y la práctica prevaleciente en la medicina, satisfaga las exigencias reconocidas generalmente por la profesión médica. *Rodríguez Crespo v. Hernández,* 121 D.P.R. 639 (1988). En estos casos, le corresponde al demandante probar, mediante preponderancia de la prueba, que el tratamiento ofrecido o dejado de ofrecer por la parte demandada fue lo que con mayor probabilidad ocasionó el daño sufrido por el paciente. La relación causal entre daño y negligencia no se puede establecer por mera conjetura. *Blas v. Hospital Nuestra Señora de la Guadalupe, supra.*

## C

Aplicando esos principios a la prueba presentada, es claro que no quedó establecida la negligencia médica en la administración del medicamento Dilantín, ni la relación causal de éste con el síndrome Steven Johnson que afectó al apelante. Ni los testimonios, ni los récords médicos establecen que la consecuencia razonable de la administración del Dilantín fue el desarrollo del síndrome. La madre del apelante testificó, además, que el personal médico negó que la causa del síndrome fue el Dilantín. Al apelante se le administraron otros medicamentos que también pueden provocar este síndrome, como el Tylenol y el Decadrón. En el récord médico de la segunda hospitalización, se indicó que el Steven Johnson desarrollado era secundario al Dilantín o a un virus. Ante la ausencia de prueba sobre la relación causal, el tribunal apelado se limitó a señalar en las determinaciones de hechos que el examen del récord médico reflejó que el diagnóstico de varias evaluaciones fue de Steven Johnson secundario a Dilantín.

Quedó probado que el tratamiento adecuado de acuerdo a los principios médicos establecidos y dada la condición presentada por el apelante, era la administración de un anticonvulsivo. Según la prueba obrante en el expediente, el Dilantín es de los 30 medicamentos más recetados en los Estados Unidos para evitar convulsiones, lo que demuestra que es un medicamento aceptado y ampliamente utilizado.

La prueba pericial demostró que el riesgo de desarrollar convulsiones por el tipo de lesión presentada por el apelante, era serio y mucho mayor al riesgo de contraer el síndrome por la administración de Dilantín o cualquier otro medicamento. La condición del señor Reyes Flores al llegar al Centro Médico dio base a la administración del anticonvulsivo. El señor Reyes Flores, según su testimonio, llegó al Centro Médico con fuertes dolores de cabeza, no recordaba lo que sucedió en el Hospital San Rafael, se sintió consciente en el Centro Médico cuando le dieron medicamento por vena. Sus manifestaciones demuestran el estado de aturdimiento en que llegó al Hospital Universitario luego de la fractura en la cabeza. Además, el CT Scan demostró que hubo contusión cerebral, que afectó la corteza, lo cual de acuerdo al testimonio pericial del doctor González, hacía probable que desarrollara convulsiones.

En definitiva, no se incumplió en este caso con el deber de cuidado requerido en Puerto Rico de los miembros de la profesión médica, puesto que se ofreció al paciente la atención y tratamiento que conforme al conocimiento científico y la práctica de la medicina satisfizo las exigencias reconocidas por la profesión

médica.

El apelante no estableció que el no haber ordenado la prueba de niveles de Dilantín, le ocasionó daños. Todos los peritos que prestaron testimonio estuvieron de acuerdo en que esta prueba tiene el propósito de detectar los niveles del medicamento en la sangre del paciente a los fines de determinar si está en los niveles adecuados para cumplir sus propósitos terapéuticos. Coincidieron también en que el sólo hecho de estar en contacto con el medicamento, puede causar la reacción. No hubo indicio alguno durante el tratamiento del señor Reyes Flores, ni en su visita de seguimiento de síntomas de toxicidad al medicamento o de que el mismo estuviera bajo los niveles terapéuticos, que ameritaran se efectuara la prueba.

Toda vez que no se estableció relación causal entre el hecho de que no se realizó la prueba de niveles de Dilantín y el síndrome posteriormente desarrollado por el paciente, no medió impericia médica por no ordenarse la prueba.

En atención a todo lo anterior, no cometió error el tribunal al evaluar la prueba, al determinar que el tratamiento de Dilantín era el adecuado y que el riesgo de Steven Johnson no era razonablemente previsible y al no determinar que la falta de ordenar la prueba de niveles de Dilantín constituyó impericia médica. Por tanto, no procede alegación del apelante de que la sentencia no representa el balance más racional, justiciero y jurídico de la evidencia. Tampoco procedían las mociones de determinaciones de hechos adicionales y de reconsideración, puesto que los planteamientos incluidos en dichas mociones no varían el resultado al que llegó el tribunal en la sentencia.

## III

El apelante alega que se violó la doctrina de consentimiento informado y que erró el tribunal al no determinarlo así. Esta doctrina surge del derecho de todo paciente a la autodeterminación. Tiene el propósito de proveer información a los pacientes,, de modo que puedan tomar una decisión inteligente e informada sobre su tratamiento. *Ríos v. Mark*, 119 D.P.R. 816 (1987). Obliga a los médicos a brindar información suficiente a sus pacientes sobre la naturaleza del tratamiento al que serán sometidos, los riesgos y los beneficios que pueden recibir. Esto es, divulgarle al paciente todos los riesgos razonablemente previsibles de su tratamiento.

Jurisprudencialmente se ha establecido que los médicos no están en la obligación de informarle a su paciente sobre consecuencias que éstos no puedan razonablemente prever o sobre riesgos remotos que sólo han ocurrido en pocas ocasiones. *Arrieta Plá v. Barreto Domínguez*, 137 D.P.R. 735 (1994); *Rodríguez Crespo v. Hernández, supra*. Se ha señalado que los elementos para adjudicar una reclamación de impericia médica por falta de consentimiento informado, que deben considerarse, son si el médico tiene el deber de divulgar determinada información, la información específica que debe ser divulgada y si la causa próxima del daño fue la falta de divulgación de esa información. *Santiago Otero v. Méndez*, 135 D.P.R. 32 (1994), nota al calce 25.

De acuerdo a la doctrina civilista moderna, el mero incumplimiento del deber de informar, no es suficiente para imputarle al médico responsabilidad civil. Para ello es necesario que el paciente haya sufrido un daño y que el mismo sea consecuencia del incumplimiento del deber de informar. *Arrieta Plá v. Barreto Domínguez, supra*.

En este caso quedó establecido que los apelados no informaron al apelante y a sus familiares de los posibles riesgos del Dilantín. Aunque es buena medida advertirle al paciente sobre todas las posibles consecuencias o riesgos de un medicamento, no es obligación que acarree responsabilidad el no advertir sobre un riesgo remoto. Conforme las normas establecidas por la jurisprudencia, el médico sólo viene obligado a informar sobre el tratamiento y los riesgos que son previsibles. Los peritos de los apelados establecieron que las probabilidades de contraer el síndrome Steven Johnson por causa del Dilantín, son menos de una en un millón. El perito del apelante desconocía el por ciento. Resulta obvio de la prueba que este síndrome no es una consecuencia previsible del Dilantín, por lo cual no existía deber de divulgar la información de ese riesgo que acarreara responsabilidad por daños.

**IV**

En virtud de que los errores alegados no fueron cometidos, se confirma la sentencia apelada.

Lo acordó y manda el Tribunal y lo certifica la Subsecretaria General.

Gladys E. Ortega Ramírez
Subsecretaria General