Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| | | |
|---|---|---|
| IRMA DE JESÚS FIGUEROA; ANÍBAL GARCÍA MATOS; Y LA SOCIEDAD LEGAL DE GANANCIALES COMPUESTA POR AMBOS<br><br>Apelantes<br><br>v.<br><br>NAGUABO MEDICAL MALL; DRA. MARITZA ACEVEDO CUEVAS, SU ESPOSO Y LA SOCIEDAD LEGAL DE GANANCIALES COMPUESTAS POR ÉSTOS; HOSPITAL HIMA FAJARDO; DR. NICOLÁS GÓMEZ AMALBERT, SU ESPOSA Y LA SOCIEDAD LEGAL DE GANANCIALES COMPUESTAS POR ÉSTOS; DRS. MIGUEL DEL PUEBLO Y SU ESPOSA/A Y LA SOCIEDAD LEGAL DE GANANCIALES COMPUESTA POR ÉSTOS; COMPAÑÍA XYZ; COMPAÑÍAS ASEGURADORAS ABC<br><br>Apelados | TA2025AP00127 | *APELACIÓN* procedente del Tribunal de Primera Instancia, Sala Superior de Fajardo<br><br>Caso número: FA2021CV00094<br><br>Sobre:<br>Daños y perjuicios extracontractuales por responsabilidad profesional médica |

Panel integrado por su presidenta, la juez Domínguez Irizarry, la juez Rivera Marchand y la juez Aldebol Mora.

Aldebol Mora, Juez Ponente

# **S E N T E N C I A**

En San Juan, Puerto Rico, a 13 de enero de 2026.

Comparece la parte apelante, integrada por Irma De Jesús Figueroa, Aníbal García Matos y la Sociedad Legal de Gananciales compuesta por ambos y nos solicita que revoquemos la *Sentencia* emitida por el Tribunal de Primera Instancia, Sala Superior de Fajardo, el 27 de marzo de 2025, la cual fue notificada al día siguiente. Asimismo, nos solicita la revisión de la *Sentencia*

*Enmendada* emitida el 10 de junio de 2025, notificada el 12 de junio del mismo año. Mediante la *Sentencia*, el foro primario declaró No Ha Lugar la *Demanda* instada en el presente caso. De otra parte, en virtud de la *Sentencia Enmendada*, el foro *a quo* reiteró su disposición de declarar No Ha Lugar la *Demanda*, aunque realizó varias modificaciones a la *Sentencia*, entre las que se destaca una enmienda a la determinación de hechos número 55, así como la adición de otras doce (12) determinaciones.

Por los fundamentos que se exponen a continuación, se confirma la *Sentencia Enmendada* apelada. En la medida que esta sustituyó a la *Sentencia* notificada el 28 de marzo de 2025, no corresponde que este Foro realice algún pronunciamiento sobre este dictamen.

**I**

El 9 de febrero de 2021, Irma De Jesús Figueroa (De Jesús Figueroa), Aníbal García Matos y la Sociedad Legal de Gananciales compuesta por ambos (en conjunto, parte apelante), presentaron una *Demanda* sobre daños y perjuicios por impericia médica, en contra del Naguabo Medical Mall, la Dra. Maritza Acevedo Cuevas (doctora Acevedo Cuevas o apelada), el Dr. Nicolás Gómez Amalbert (doctor Gómez Amalbert), el Hospital HIMA San Pablo Fajardo (Hospital HIMA) y los demás codemandados de epígrafe.[1] En esencia, la parte apelante alegó que De Jesús Figueroa fue víctima de negligencia como parte de la asistencia médica que requirió de los demandados, tras un incidente en el que se le rompió una cafetera de cristal y se le alojó un pedazo de vidrio en la planta del pie derecho.

Como remedios, reclamó una indemnización ascendente a $300,000.00 en resarcimiento por los daños emocionales y

---

[1] Entrada Núm. 1 del caso núm. FA2021CV00094 del SUMAC.

angustias mentales que alegó sufrir, así como $7,000.00, por concepto de daños especiales. Asimismo, solicitó la imposición de honorarios de abogado por temeridad.

El 23 de abril, el 12 de mayo, el 23 de junio y el 9 de julio de 2021, el doctor Gómez Amalbert, el Hospital HIMA, el Naguabo Medical Mall y la doctora Acevedo Cuevas, respectivamente, presentaron cada uno un escrito de *Contestación a Demanda.*[2] Sin embargo, en cuanto al Naguabo Medical Mall y el Hospital HIMA, el 13 de octubre de 2021, la parte apelante solicitó el desistimiento voluntario con perjuicio,[3] el cual fue acogido por el foro primario mediante una *Sentencia Parcial* emitida y notificada el 15 de octubre de 2021.[4] En cuanto al doctor Gómez Amalbert, el 27 de abril de 2022, la parte apelante también solicitó el desistimiento voluntario con perjuicio.[5] Así, el 28 de abril de 2022, el foro primario emitió una *Sentencia Parcial,* que notificó el 29 de abril del mismo año, mediante la cual acogió la solicitud,[6] por lo que, a esa fecha, <u>la única demandada que subsistió en el pleito lo fue la doctora Acevedo Cuevas</u>.

Luego de varias incidencias procesales, el 23 de junio de 2022, la doctora Acevedo Cuevas presentó una *Moción de Desestimación por Prescripción,* en la que, esencialmente, argumentó que la causa de acción en su contra estaba prescrita.[7] Tras solicitar y obtener una prórroga, el 12 de agosto de 2022, la parte apelante presentó un escrito en oposición.[8] Así, el 21 de marzo de 2023 el foro *a quo* la declaró No Ha Lugar.[9]

---

[2] Entradas Núm. 17, 19, 28 y 32 del caso núm. FA2021CV00094 del SUMAC.
[3] Entrada Núm. 48 del caso núm. FA2021CV00094 del SUMAC.
[4] Entrada Núm. 50 del caso núm. FA2021CV00094 del SUMAC.
[5] Entrada Núm. 63 del caso núm. FA2021CV00094 del SUMAC.
[6] Entrada Núm. 64 del caso núm. FA2021CV00094 del SUMAC.
[7] Entrada Núm. 68 del caso núm. FA2021CV00094 del SUMAC.
[8] Entrada Núm. 72 del caso núm. FA2021CV00094 del SUMAC.
[9] Entrada Núm. 96 del caso núm. FA2021CV00094 del SUMAC.

Inconforme, la doctora Acevedo Cuevas solicitó reconsideración[10] y, el 11 de abril de 2023, la parte apelante presentó un escrito de oposición.[11] Posteriormente, el 11 de abril de 2023, el foro primario declaró No Ha Lugar la moción de reconsideración.[12]

Todavía inconforme, el 8 de mayo de 2023, la doctora Acevedo Cuevas presentó una petición de *certiorari* y solicitud de auxilio de jurisdicción ante este Foro.[13] Ese mismo día, decretamos la paralización de los procedimientos ante el foro primario. Con posterioridad, y tras evaluar la postura de ambas partes, el 28 de junio de 2023, emitimos y notificamos una *Sentencia*, mediante la cual expedimos el auto discrecional solicitado y revocamos al foro *a quo*.[14] Ello, por considerar que, en efecto, la *Demanda* de epígrafe instada en contra de la apelada estaba prescrita y que procedía su desestimación.

Insatisfecha, el 31 de julio de 2023, la parte apelante instó una petición de *certiorari* ante el Tribunal Supremo.[15] Tras evaluar la postura de las partes, el Alto Foro expidió el recurso y, mediante una *Sentencia* emitida y notificada el 9 de abril de 2024, revocó nuestra determinación y ordenó la continuación de los procedimientos ante el foro primario.[16]

Luego de culminado el descubrimiento de prueba, así como tras celebrar la conferencia con antelación al juicio, el juicio en su fondo se llevó a cabo los días 21 y 23 de enero, y 20 de febrero de 2025. El juicio contó con la comparecencia de ambas partes, representadas por sus respectivos abogados.

---

[10] Entrada Núm. 97 del caso núm. FA2021CV00094 del SUMAC.
[11] Entrada Núm. 99 del caso núm. FA2021CV00094 del SUMAC.
[12] Entrada Núm. 100 del caso núm. FA2021CV00094 del SUMAC.
[13] Caso núm. KLCE202300513. Véase Entrada Núm. 103 del caso núm. FA2021CV00094 del SUMAC.
[14] Entrada Núm. 106 del caso núm. FA2021CV00094 del SUMAC.
[15] Entrada Núm. 107 del caso núm. FA2021CV00094 del SUMAC.
[16] Caso núm. CC-2023-0503. Véase Entrada Núm. 121 del caso núm. FA2021CV00094 del SUMAC.

Durante el juicio, la prueba testifical presentada por la parte apelante consistió en los siguientes testigos: Dr. Edwin Miranda (doctor Miranda), en calidad de perito especialista en medicina de emergencia; el cónyuge de De Jesús Figueroa, Aníbal García Matos, quien también figura como codemandante de epígrafe y la propia De Jesús Figueroa, quien llegó a ocupar la silla de los testigos, pero se vio imposibilitada de testificar debido a su condición de Alzheimer. En cuanto a la prueba testifical de la parte apelada, testificó la doctora Acevedo Cuevas y el Dr. Carlos A. Gómez Marcial, como perito en medicina de sala de emergencias.

En cuanto a la prueba documental, las partes estipularon los siguientes documentos: 1) copia certificada del expediente del Naguabo Medical Mall; 2) copia certificada del expediente del Hospital HIMA; 3) copia certificada del expediente del Hospital Oriente. Adicional a los exhibits que fueron estipulados, la parte apelante presentó la siguiente prueba documental: 1) *Curriculum Vitae* de su perito, el doctor Miranda; 2) Informe pericial del doctor Miranda; 3) Tres imágenes radiográficas del pie derecho de De Jesús tomadas en el Hospital HIMA.

Durante el juicio, luego de que la parte apelante terminó el desfile de su prueba y dio por sometido el caso, la apelada argumentó una moción de desestimación, de conformidad con la Regla 39.2(c) de Procedimiento Civil, 32 LPRA Ap. V, R. 39.2(c). Ello, sin renunciar a su derecho de presentar prueba.[17] En esencia, argumentó que procede en derecho la desestimación del caso,

---

[17] La Regla 39.2(c) dispone lo siguiente: "Después que la parte demandante haya terminado la presentación de su prueba, la parte demandada, sin renunciar al derecho de ofrecer prueba en caso de que la moción sea declarada 'sin lugar', podrá solicitar la desestimación fundándose en que bajo los hechos hasta ese momento probados y la ley, la parte demandante no tiene derecho a la concesión de remedio alguno. El tribunal podrá entonces determinar los hechos y dictar sentencia contra la parte demandante, o podrá negarse a dictar sentencia hasta que toda la prueba haya sido presentada. A menos que el tribunal lo disponga de otro modo en su orden de desestimación, una desestimación bajo esta Regla 39.2 y cualquier otra desestimación, excepto la que se haya dictado por falta de jurisdicción o por haber omitido acumular una parte indispensable, tienen el efecto de una adjudicación en los méritos".

debido a que, en los hechos, según probados o establecidos con la oferta de prueba de la parte demandante, no se constituyen todos los elementos de la causa de acción. Por su parte, la parte apelante argumentó su oposición a dicha moción. Luego de escuchar las argumentaciones, el foro primario se reservó el fallo y permitió que la apelada presentara su prueba.

Así, luego de aquilatar la prueba testifical y documental que ambas partes presentaron durante el juicio, el 27 de marzo de 2025, el foro primario emitió una *Sentencia,* que fue notificada al día siguiente.[18] En esta, formuló 55 determinaciones de hechos y concluyó que la parte apelante no logró establecer mediante la prueba presentada, que la doctora Acevedo Cuevas incurriera en conducta negligente con relación a la evaluación, diagnóstico y tratamiento brindado a De Jesús Figueroa. En consecuencia, el foro *a quo* declaró No Ha Lugar la *Demanda* de epígrafe y ordenó el archivo de la causa de acción.

En desacuerdo, el 14 de abril de 2025, la parte apelante presentó un escrito en el que solicitó la reconsideración del dictamen, así como que se enmendaran varias determinaciones de hechos y se emitieran otras determinaciones adicionales.[19] En cuanto a la solicitud de enmienda, la parte apelante solicitó que el foro primario enmendase la determinación de hechos número 55, a los efectos de aclarar que la "aguja metálica" finalmente extraída de la planta del pie derecho de De Jesús Figueroa era un "alfiler", mas no una aguja de "cocer [sic]", como consignó el foro primario. Por su parte, el 9 de mayo de 2025, la doctora Acevedo Cuevas presentó su postura al respecto, mediante un escrito que tituló *Moción en Cumplimiento de Orden.*[20]

---

[18] Entrada Núm. 140 del caso núm. FA2021CV00094 del SUMAC.
[19] Entrada Núm. 148 del caso núm. FA2021CV00094 del SUMAC.
[20] Entrada Núm. 155 del caso núm. FA2021CV00094 del SUMAC.

Tras evaluar ambas posturas, el 10 de junio de 2025, el foro primario emitió la *Sentencia Enmendada* apelada, la cual fue notificada a las partes el 12 de junio del mismo año.[21] Ello, con varios propósitos; a saber: 1) enmendar la determinación de hechos número 55, para aclarar que la aguja metálica finalmente extraída del pie derecho de De Jesús Figueroa era, en efecto, un "alfiler", mas no una aguja de "cocer [sic]", como se consignó en la *Sentencia* original; 2) A las 55 determinaciones de hechos formuladas originalmente en la *Sentencia* original, el foro primario añadió otras doce (12), entiéndase, las determinaciones de hechos #56 a la #67; 3) En sus conclusiones de derecho, el foro primario añadió texto conducente a concluir que hubo consentimiento adecuado de acuerdo con las circunstancias de este caso, así como que el cuerpo extraño finalmente extraído del pie de De Jesús llegó a su pie *luego* de la intervención de la doctora Acevedo Cuevas.

Todavía inconforme, el 14 de julio de 2025, la parte apelante acudió ante este Foro mediante el recurso de apelación que nos ocupa, en el que señaló los siguientes errores:

> Erró el TPI al no emitir como determinación de hecho adicional que el expediente médico del Naguabo Medical Mall no contiene constancia de consentimiento informado específico para el procedimiento invasivo realizado.

> Erró el TPI al no emitir como determinación de hecho adicional que la Dra. Acevedo no orientó a Doña Irma sobre la naturaleza del procedimiento, sus riesgos ni alternativas, conforme al propio testimonio de la doctora en juicio.

> Erró el TPI al concluir que los Apelantes no presentaron prueba suficiente para establecer el nexo causal entre la falta de consentimiento informado y el daño sufrido por Doña Irma, a pesar de la prueba pericial y testifical desfilada que acreditaba la previsibilidad del riesgo al que fue expuesta.

> Erró el TPI al aplicar incorrectamente el estándar jurídico aplicable a las reclamaciones por falta de consentimiento informado, al exigir prueba de causalidad conforme a una teoría de impericia

---

[21] Entrada Núm. 156 del caso núm. FA2021CV00094 del SUMAC.

tradicional y no conforme a lo resuelto en *Sepúlveda de Arrieta v. Barreto*, 137 DPR 735 (1995).

Erró el TPI al otorgarle total credibilidad al perito de la parte apelada, Dr. Gómez, sin atender ni adjudicar adecuadamente los fundamentos técnicos, experiencia y razonamiento pericial ofrecido por el Dr. Miranda.

Erró el TPI al no considerar como determinación de hecho que la técnica utilizada por la Dra. Acevedo -introducir agujas para localizar un cuerpo extraño- carece de respaldo en la literatura médica y no se ajusta a la mejor práctica, según testimonio del perito Dr. Miranda.

Erró el TPI al permitir que la apelada introdujera, mediante su perito Dr. Gómez, opiniones sobre consentimiento informado sin que dicho tema estuviera incluido en su informe pericial, en contravención de las normas procesales y jurisprudencia aplicable sobre el alcance del testimonio pericial.

Erró el TPI al negarse a enmendar la determinación de hecho núm. 55 para eliminar la referencia a "aguja de coser", a pesar de que dicha frase no fue utilizada en juicio, y proceder solo a sustituirla por "alfiler" frase que tampoco fue utilizada en juicio.

Erró el TPI al negarse a emitir determinaciones adicionales propuestas por los Apelantes relacionadas con la falta de documentación clínica relevante en el expediente médico, las omisiones en la descripción de la herida y el procedimiento realizado, lo que conforme a la jurisprudencia vigente afecta la credibilidad del médico tratante.

Erró el TPI al otorgarle mayor peso a la teoría especulativa de la apelada de que la aguja metálica pudo haberse introducido en el pie de Doña Irma con posterioridad a la intervención médica, cuando la prueba desfilada demuestra que, con la mayor probabilidad, el cuerpo extraño fue introducido durante el procedimiento realizado por la Dra. Acevedo.

Erró el TPI al no reconsiderar la sentencia a la luz de la totalidad de la prueba desfilada, la cual establecía que la actuación de la Dra. Acevedo se apartó de la mejor práctica médica y fue causa próxima de los daños reclamados.

El mismo día en que instó el recurso de apelación que nos ocupa, la parte apelante solicitó autorización para presentar una transcripción de la prueba oral (TPO), la cual le concedimos. Luego de solicitar varias prórrogas, que también autorizamos, el 23 de octubre de 2025, la parte apelante presentó la TPO, así como su

*Alegato Suplementario*. Por su parte, el 18 de noviembre de 2025, la apelada presentó un *Alegato en Oposición*.

Finalmente, tras evaluar la TPO, así como luego de considerar los argumentos esbozados por ambas partes en sus respectivas comparecencias escritas, procedemos a resolver.

## II

## A

Sabido es que este Tribunal de Apelaciones actúa, esencialmente, como foro revisor. *Dávila Nieves v. Meléndez Marín*, 187 DPR 750, 770 (2013). Por tanto, nuestra encomienda principal es examinar cómo los tribunales de menor jerarquía aplican el Derecho a los hechos particulares de cada caso. *Íd.* Cónsono con lo anterior, el desempeño de nuestra función revisora se fundamenta en que el Tribunal de Primera Instancia desarrolle un expediente completo que incluya los hechos que haya determinado ciertos a partir de la prueba que se le presentó. *Íd.*

Es decir, nuestra función de aplicar y pautar el Derecho requiere saber cuáles son los hechos, tarea que corresponde, primeramente, al foro primario. *Íd.* Como foro apelativo, no celebramos juicios plenarios, no presenciamos el testimonio oral de los testigos, no dirimimos credibilidad y no hacemos determinaciones de hechos. *Íd.* Esa es la función del Tribunal de Primera Instancia. *Íd.*

Por el contrario, al momento de analizar prueba documental, prueba pericial o testimonios de testigos ofrecidos mediante declaraciones escritas, estamos en la misma posición que el Tribunal de Primera Instancia. *Ortiz et al. v. S.L.G. Meaux*, 156 DPR 488, 495 (2002). Así, el Tribunal Supremo considera que este foro apelativo intermedio "tendrá la facultad para adoptar su propio criterio en la apreciación y evaluación de la prueba pericial, y hasta para descartarla, aunque resulte técnicamente correcta". *Santiago*

*Ortiz v. Real Legacy et al.*, 206 DPR 194, 219 (2021), citando a *González Hernández v. González Hernández*, 181 DPR 746, 777 (2011).

Asimismo, es norma básica que estamos en posición de revisar en su totalidad las conclusiones de derecho. *Dávila Nieves v. Meléndez Marín*, supra, pág. 770. Ahora bien, como norma general, los tribunales apelativos aceptan como correctas las determinaciones de hechos de los tribunales de menor jerarquía, así como su apreciación sobre la credibilidad de los testigos y el valor probatorio de la prueba presentada en la sala. *Íd.*, pág. 771.

En nuestro ordenamiento jurídico no se favorece la intervención de los foros revisores para pasar juicio sobre la apreciación de la prueba por parte del foro primario, así como su adjudicación de credibilidad o las determinaciones de hechos que haya formulado, en ausencia de pasión, prejuicio, parcialidad o error manifiesto. *Sucn. Mena Pamias et al. v. Meléndez et al.*, 212 DPR 758, 774 (2023); *Pueblo v. Hernández Doble*, 210 DPR 850, 864 (2022); *Santiago Ortiz v. Real Legacy et al.*, supra. Ello, debido a que el foro adjudicador está en mejor posición que un foro revisor para llevar a cabo esta importante tarea judicial. *Dávila Nieves v. Meléndez Marín*, supra, pág. 771.

De este modo, en consideración a la norma de corrección que cobija a las determinaciones realizadas por el Tribunal de Primera Instancia, cuando una parte peticionaria señala errores dirigidos a cuestionar la apreciación o suficiencia de la prueba, la naturaleza del derecho apelativo requiere que esta ubique al foro revisor en tiempo y espacio de lo ocurrido en el foro primario. Ello se logra utilizando alguno de los mecanismos de recopilación de prueba oral, como lo son: (1) transcripción de la prueba, (2) exposición estipulada o (3) exposición narrativa. *Pueblo v. Pérez Delgado*, 211 DPR 654, 671 (2023). Los tribunales de mayor jerarquía no pueden cumplir a

cabalidad su función revisora sin que se le produzca, mediante alguno de estos mecanismos, la prueba que tuvo ante sí el foro primario. *Íd.*

**B**

Los actos y omisiones en que intervenga cualquier género de culpa o negligencia son fuentes de obligaciones que generan responsabilidad civil extracontractual. Artículo 1042 del Código Civil de 1930, 31 LPRA sec. 2992.[22] Por ello, el Artículo 1802 del Código Civil de 1930 establece que, "[e]l que por acción u omisión causa daño a otro, interviniendo culpa o negligencia, está obligado a reparar el daño causado [...]". 31 LPRA sec. 5141. De este modo, la responsabilidad civil al amparo de esta norma requiere la concurrencia de tres elementos, a saber: (1) la existencia de un daño real; (2) el nexo causal entre el daño y la acción y omisión del demandado y (3) el acto u omisión, el cual tiene que ser culposo o negligente. *Sucn. Mena Pamias et al. v. Meléndez et al.*, 212 DPR 758, 768 (2023); *Nieves Díaz v. González Massas*, 178 DPR 820, 843 (2010); *López v. Porrata Doria*, 169 DPR 135, 150 (2006).

En *Rodríguez et al. v. Hospital et al.*, 186 DPR 889, 900 (2016), se reiteró y recalcó que una acción para exigir responsabilidad profesional a un médico no es distinta a la de un caso ordinario de daños y perjuicios por negligencia al amparo del Artículo 1802 del Código Civil, *supra.* Por tanto, al igual que cualquier otra causa de acción por daños y perjuicios, la reclamación por impericia médica requiere que la parte demandante establezca por preponderancia de la evidencia, creída por el juzgador, que los actos de negligencia, falta de cuidado o impericia del médico causaron el daño reclamado. *Íd.*

---

[22] El derecho aplicable en el caso de autos se remite al Código Civil de Puerto Rico de 1930, 31 LPRA sec. 1 *et seq.* (derogado), toda vez que nos encontramos ante hechos ocurridos con anterioridad a la aprobación y vigencia del Código Civil de Puerto Rico de 2020, Ley Núm. 55-2020, 31 LPRA sec. 5311 *et seq.*

En los casos de impericia médica es necesario que el promovente de la acción demuestre la ocurrencia de un acto médico culposo o negligente, la producción de un daño real y la relación causal entre el acto del médico y el daño sufrido. *Soto Cabral v. ELA*, 138 DPR 298, 308-309 (1995). De este modo, le corresponde al demandante probar, mediante preponderancia de la prueba, que las acciones negligentes del médico fueron el factor que, con mayor probabilidad, ocasionó el daño sufrido y establecer el nexo causal requerido por el Artículo 1802 del Código Civil de Puerto Rico de 1930*, supra. Castro Ortiz v. Mun. de Carolina*, 134 DPR 783, 793 (1993); *Pagán Rivera v. Mun. de Vega Alta*, 127 DPR 538 (1990); *Torres Ortiz v. Plá*, 123 DPR 637 (1989); *Rodríguez Crespo v. Hernández*, 121 DPR 639, 650 (1988).

Sin embargo, en nuestra jurisdicción rige una presunción a favor del médico que sugiere que este haya observado un grado razonable de cuidado y atención en la administración del tratamiento médico y que los exámenes practicados al paciente hayan sido adecuados. Por ello, le corresponde a la parte demandante controvertir esta presunción con prueba que demuestre algo más que una mera posibilidad de que el daño se debió al incumplimiento del médico con su obligación profesional. Es decir, que la relación de causalidad no se puede establecer a base de una mera especulación o conjetura. *López v. Dr. Cañizares*, 163 DPR 119, 134-135 (2004); *Blás v. Hosp. Guadalupe,* 146 DPR 267, 324 (1998). *Santiago Otero v. Méndez*, 135 DPR 540, 549 (1994).

Al evaluar esta prueba, el tribunal debe considerar que en nuestro ordenamiento jurídico las normas mínimas de cuidado, conocimiento y destrezas que le son requeridas a los profesionales de la salud, en casos de alegada mala práctica profesional, son las de brindar a sus pacientes aquella atención que, "a la luz de los modernos medios de comunicación y enseñanza, y conforme al

estado de conocimiento de la ciencia y la práctica prevaleciente de la medicina, satisface las exigencias profesionales generalmente reconocidas por la profesión médica". *López v. Dr. Cañizares*, supra, pág. 133; *Santiago Otero v. Méndez*, supra.

Asimismo, es necesario tener presente que la negligencia del médico no se presume por el hecho de que el paciente haya sufrido un daño o que el tratamiento no haya sido exitoso. *López v. Dr. Cañizares*, supra; *Rodríguez Crespo v. Hernández*, supra, pág. 650. Al respecto, se ha dicho que, para establecer un caso *prima facie* de impericia médica, se tiene que presentar prueba sobre: (1) las normas mínimas de conocimiento y cuidado médico aplicables a los generalistas o a los especialistas; (2) demostrar que la parte demandada incumplió con estas normas en el tratamiento del paciente; y (3) demostrar que esta fue la causa de la lesión sufrida por el paciente. *Arrieta v. Dr. de la Vega*, 165 DPR 538, 548-549 (2005); *Medina Santiago v. Vélez*, 120 DPR 380, 385 (1988); *Rodríguez Crespo v. Hernández*, supra, pág. 650.

Lo anterior quiere decir que le corresponde a la parte demandante establecer, mediante prueba pericial, cuáles son los requisitos de cuidado y conocimiento científico requeridos por la profesión en un tratamiento determinado, las normas de conocimiento informado y la razón por la cual el médico demandado no cumplió con las mismas. *Rodríguez Crespo v. Hernández*, supra, págs. 650-651; *Medina Santiago v. Vélez*, supra, pág. 385. Conforme a la norma antes indicada, el médico solamente responde por los daños y perjuicios causados cuando actúa negligentemente, con descuido o cuando falta a la pericia profesional que exigen las circunstancias. *Ríos Ruiz v. Mark*, 119 DPR 816, 820 (1987); *López v. Dr. Cañizares*, supra, pág. 134.

**C**

El consentimiento del paciente es un elemento indispensable para llevar a cabo un procedimiento médico quirúrgico, tratamiento o procedimiento médico que resulte invasivo al cuerpo humano, salvo las situaciones excepcionales de emergencia y perjuicio al estado sicológico de aprehensión del paciente. Para que se entienda cumplido ese criterio esencial en casos de impericia médica, además de obtenerse el consentimiento expreso del paciente, es necesario que ese consentimiento sea informado. *Rodríguez Crespo v. Hernández*, supra, pág. 664; *Rojas v. Maldonado*, 68 DPR 818, 827 (1948).

El fundamento jurídico es que todas las personas tienen el derecho constitucional a decidir libremente sobre su cuerpo. Como corolario, los tribunales han resuelto en reiteradas ocasiones que los doctores tienen la obligación de obtener el consentimiento informado de sus pacientes previo a emplear cualquier tratamiento o intervención quirúrgica. Así, el término "consentimiento informado" impone a los galenos el deber de ofrecer a sus pacientes toda la información que sea indispensable para comprender la naturaleza de cierto procedimiento, lo cual debe incluir datos sobre los beneficios, los riesgos y las posibles complicaciones. *Martínez Marrero v. González Droz*, 180 DPR 579, 593 (2011).

Por lo general, la controversia se enfoca en cuánta información el médico debe darle al paciente para que su consentimiento no esté viciado o sea suficiente para tomar una decisión inteligente. Sobre el particular, nuestro Tribunal Supremo ha reiterado que el médico deberá divulgar, tanto los riesgos razonablemente previsibles, como los beneficios del tratamiento o procedimiento invasivo. También deberá informar sobre alternativas disponibles y sobre los riesgos probables a los que se enfrenta, en

caso de que el paciente opte por no tratarse la condición. *Rodríguez Crespo v. Hernández*, supra, págs. 663-664.

A su vez, el Tribunal Supremo pautó como norma que, "[l]a doctrina del consentimiento informado impone al médico el deber de informar al paciente acerca de la naturaleza y riesgos de un tratamiento médico propuesto de manera que el paciente se encuentre en la posición de hacer una decisión inteligente e informada". *Rodríguez Crespo v. Hernández*, supra, pág. 664.

Así, el estándar adoptado por el Tribunal Supremo en *Sepúlveda De Arrieta v. Barreto*, 137 DPR 735 (1994), es el siguiente:

> [A]carrea para el médico el deber de informar aquellos riesgos, conforme lo establecido por la práctica prevaleciente de la medicina. Bajo ninguna circunstancia, ni siquiera en aquellos tratamientos que no entrañen ningún fin curativo, tendrá el médico el deber de informar sobre los riesgos que sean remotos, que hayan ocurrido en pocas ocasiones o que sean meramente hipotéticos. *Íd.* pág. 753.

Al aplicar la doctrina de la causalidad adecuada al tema del consentimiento de un paciente, la controversia consiste en determinar si, dentro del curso normal de los hechos, se le debe exigir al médico prever que la falta de información debida hubiera llevado al paciente a adoptar una decisión distinta. Según el Tribunal Supremo, no es necesario que el médico haga esta determinación con certeza matemática para que le sea exigible el mandato del Artículo 1802 del Código Civil, *supra*, sino que basta con que la negligencia incurrida por este, en el curso normal de los hechos acontecidos, muy probablemente pudo ocasionar el daño. *Sepúlveda De Arrieta v. Barreto*, supra, pág. 760.

Finalmente, al alegarse la falta de consentimiento del paciente como causa del daño sufrido, luego de una intervención médica, será necesario que se presente prueba sobre las normas de consentimiento informado que sean aplicables al caso y la razón por la cual el médico incumplió con ellas, o el modo en que incumplió.

*Rodríguez Crespo v. Hernández,* supra, pág. 666. La cadena causal entre la omisión del médico al informar y la materialización del riesgo no divulgado debe cumplir con dos requisitos: (1) la falta de divulgación debió haber causado que el paciente consintiera al procedimiento propuesto; y (2) el procedimiento debió haber causado daño al paciente. *Sepúlveda De Arrieta v. Barreto,* supra, págs. 756-757.

Así pues, los elementos esenciales en una reclamación por daños y perjuicios basados en una alegación de impericia médica por no obtener el médico un consentimiento informado del paciente, antes de efectuar una operación o tratamiento son: (1) determinar si el médico tenía el deber de divulgar determinada información; (2) determinar la información específica que debe ser divulgada y (3) determinar si la causa próxima del daño alegado fue la falta de divulgación de los riesgos implícitos en dicha operación o tratamiento. En la zona de impericia médica, la doctrina del consentimiento informado se basa en el derecho fundamental que consagra la inviolabilidad del cuerpo humano como un derecho inalienable de las personas. *Santiago Otero v. Méndez,* 135 DPR 540 (1994), a la nota al calce núm. 24.

A la luz de la normativa antes expuesta, procedemos a disponer del caso ante nuestra consideración.

### III

En virtud de la apelación de epígrafe, la parte apelante argumentó que el foro primario incurrió en diez desaciertos. De estos, cinco giran en torno a planteamientos sobre ausencia de consentimiento informado; a saber, los señalamientos de error primero, segundo, tercero, cuarto y séptimo. Debido a que estos son susceptibles de discusión conjunta, procedemos a su análisis.

Mediante los señalamientos de error primero, segundo, tercero, cuarto y séptimo, la parte apelante argumentó que el foro *a*

*quo* erró al omitir determinar que el expediente médico del Naguabo Medical Mall no contiene constancia de consentimiento informado específico para el procedimiento invasivo realizado. Asimismo, esbozó que la doctora Acevedo Cuevas no orientó a De Jesús Figueroa sobre la naturaleza del procedimiento, sus riesgos y otras posibles alternativas. De forma cónsona, la parte apelante también sostuvo que el foro primario erró al concluir que la parte apelante no presentó prueba suficiente para establecer el nexo causal entre la falta de consentimiento informado y el daño sufrido por De Jesús Figueroa. Ello, por considerar que la prueba pericial y testifical desfilada acreditaba la previsibilidad del riesgo al que fue expuesta.

Así, la parte apelante considera que el foro primario aplicó incorrectamente el estándar jurídico correspondiente a las reclamaciones por falta de consentimiento informado, al exigir prueba de causalidad conforme a una teoría de impericia tradicional y no conforme a lo resuelto en *Sepúlveda de Arrieta v. Barreto*, 137 DPR 735 (1995). Por último, la parte apelante cuestiona que el foro *a quo* permitiese que la parte apelada introdujese, mediante el testimonio de su perito, opiniones sobre consentimiento informado sin que dicho tema estuviera incluido en su informe pericial. Lo anterior, en contravención de las normas procesales y a la jurisprudencia aplicable sobre el alcance del testimonio pericial. No tiene razón.

Por su pertinencia a la discusión sobre consentimiento informado, procedemos a destacar las determinaciones de hechos siguientes, según se desprenden de la *Sentencia Enmendada* apelada:

[…]

56. Según declaró el Dr. Gómez Marcial [perito de la apelada], la Dra. Acevedo supo que atender [sic] a la Sra. De Jesús porque surge un consentimiento para el tratamiento para ese 2 de septiembre de 2018.

[...]

58. Según declaró el Dr. Gómez Marcial, del expediente médico en el Naguabo Medical Mall surge que la Sra. De Jesús fue al Naguabo Medical Mall para que le extrajeran el cuerpo extraño que tenía en el pie.

59. Según declaró el Dr. Gómez Marcial, del expediente médico en el Naguabo Medical Mall surge que tanto la Dra. Acevedo como la enfermera hablaron con la paciente, quien entendió el procedimiento.

60. El Dr. Gómez, durante el contrainterrogatorio, declaró que el consentimiento brindado por la paciente fue uno general para recibir el tratamiento necesario para el diagnóstico y tratamiento en esa sala de emergencia.[23]

Basado en las determinaciones antes citadas, el foro *a quo* concluyó lo siguiente:

[E]l riesgo de que alguna aguja hipodérmica que se utilizase en el proceso de extraer el pedazo de cristal del pie derecho de la Sra. Irma De Jesús se rompiera era extremadamente remoto. Por tanto, resulta forzoso concluir que ese riesgo no requería divulgación en este caso. Además, la prueba desfilada y creída estableció que el cuerpo extraño que finalmente se extrajo del pie derecho de la paciente era un alfiler y llegó al pie derecho posterior a la intervención de la Dra. Acevedo, por lo que, **la falta de alegado consentimiento informado tampoco tiene una relación causal con los daños reclamados**. Añadimos que, al no haber declarado la Sra. Irma De Jesús, este tribunal no puede especular si ella hubiese necesitado más información o si se le explicaron todos los riesgos que ella necesitaba para consentir al procedimiento de extracción del pedazo de cristal porque solo ella hubiese podido declarar sobre eso y no lo hizo, dejando al tribunal solo con la información que aparece en las **páginas de los récords médicos de donde surge un consentimiento para recibir tratamiento en el Naguabo Medical Mall a donde ella acudió precisamente para que le sacaran el pedazo de cristal de su pie derecho**. Por lo anterior, este tribunal no alberga dudas en cuanto a que hubo consentimiento adecuado para las circunstancias de este caso.[24] (Negrillas suplidas).

En primer lugar, subrayamos que el estándar de Derecho aplicable a la revisión de las determinaciones de hechos que emite el foro primario tras haber aquilatado la prueba presentada durante un juicio nos llama a dar deferencia al criterio del foro *a quo*. Ello,

---

[23] *Sentencia Enmendada*, pág. 7. Entrada Núm. 156 del caso núm. FA2021CV00094 del SUMAC.
[24] *Sentencia Enmendada*, pág. 13. Entrada Núm. 156 del caso núm. FA2021CV00094 del SUMAC.

en ausencia de pasión, prejuicio, parcialidad o error manifiesto.[25] Así, para adjudicar adecuadamente los señalamientos esbozados por la parte apelante a los fines de argumentar que hubo ausencia de consentimiento informado y que ello fue la causa próxima de los daños reclamados, es necesario pasar juicio sobre la corrección de las determinaciones de hechos antes citadas.

De este modo, luego de evaluar la postura de las partes y de estudiar la TPO del juicio en su fondo, a la luz del mencionado estándar de revisión, concluimos que el ejercicio llevado a cabo por el foro *a quo* fue adecuado y razonable, ya que descansan en la prueba. En consecuencia, dicho ejercicio amerita nuestra deferencia. Sobre el consentimiento informado, el foro primario concluyó -a nuestro juicio, de modo acertado- que no procedía imponerle responsabilidad a la doctora Acevedo Cuevas. Ello, debido a que la parte apelante no demostró que la apelada incurriese en conducta negligente "con relación a la evaluación, diagnóstico y tratamiento brindado a la Sra. De Jesús, ni tampoco haya habido ausencia de consentimiento informado **o que, de haberlo, tuviera alguna relación causal** con los daños reclamados".[26] (Negrillas suplidas).

Acorde con la prueba desfilada por las partes durante el juicio, a De Jesús Figueroa se le introdujo vidrio en la zona plantar de su pie derecho, como resultado de un incidente en su hogar provocado por la rotura de una cafetera de cristal. Con la asistencia de García Matos, su cónyuge, el **2 de septiembre de 2018**, tres días después de ocurridos los hechos, acudió al Naguabo Medical Mall a solicitar asistencia médica. Allí, fue atendida por la doctora Acevedo Cuevas, quien identificó el pedazo de vidrio en la zona plantar y lo extrajo

---

[25] *Sucn. Mena Pamias et al. v. Meléndez et al.*, 212 DPR 758, 774 (2023); *Pueblo v. Hernández Doble*, 210 DPR 850, 864 (2022).
[26] *Sentencia Enmendada,* pág. 16. Entrada Núm. 156 del caso núm. FA2021CV00094 del SUMAC.

con una aguja quirúrgica o hipodérmica, tras lo cual la desechó sin que estuviera rota.[27] Lo anterior, fue creído por el foro *a quo* tras aquilatar la prueba desfilada durante el juicio y este Foro, luego de leer detalladamente la TPO del juicio, no se encuentra en posición de interferir con dicho criterio.

Así, también es un hecho probado que, con posterioridad a la intervención de la doctora Acevedo Cuevas, el **12 de septiembre de 2018,** De Jesús Figueroa acudió al Hospital HIMA,[28] debido a que aseguró continuar con molestias en el pie derecho. Allí, a De Jesús Figueroa se le realizaron tres radiografías del pie derecho, que reflejaron la presencia de un cuerpo extraño, que se mostraba recto *entre los dedos del pie.*[29] Finalmente, con posterioridad a la visita de De Jesús Figueroa al Hospital HIMA, acudió donde un cirujano que le extrajo una "aguja metálica", que resultó ser, de conformidad con la determinación de hechos número 55 de la *Sentencia Enmendada* apelada, "un alfiler".[30]

Ahora bien, es importante reseñar que el grueso de la causa de acción instada por la parte apelante en contra de la doctora Acevedo Cuevas se basa en el supuesto de que esta incurrió en impericia profesional médica al extraerle el pedazo de cristal al que hicimos referencia. De este modo, es la teoría de la parte apelante que, cuando la doctora Acevedo Cuevas intervino a De Jesús Figueroa con la aguja hipodérmica, esta se partió y se quedó dentro de la zona plantar. Asimismo, que ese pedazo de aguja es el cuerpo extraño que identificaron más tarde en el Hospital HIMA y que luego un cirujano le extirpó. Sin embargo, el foro primario consideró que

---

[27] Véase, determinaciones de hechos núm. 39-41; *Sentencia Enmendada*, pág. 6. Entrada Núm. 156 del caso núm. FA2021CV00094 del SUMAC.
[28] Véase, determinación de hechos núm. 11; *Sentencia Enmendada*, pág. 4. Entrada Núm. 156 del caso núm. FA2021CV00094 del SUMAC.
[29] Véase, determinación de hechos núm. 23; *Sentencia Enmendada*, pág. 5. Entrada Núm. 156 del caso núm. FA2021CV00094 del SUMAC.
[30] Véase, determinación de hechos núm. 55; *Sentencia Enmendada*, pág. 7. Entrada Núm. 156 del caso núm. FA2021CV00094 del SUMAC.

la parte apelante no pudo probar su teoría mediante el estándar aplicable de preponderancia de la prueba, con lo cual este Foro coincide.

Para continuar nuestro análisis sobre el aspecto antes mencionado, resulta pertinente abordar el quinto señalamiento de error formulado en el recurso ante nos. Mediante este, la parte apelante cuestionó que el foro primario le otorgase total credibilidad al perito de la parte apelada, sin atender ni adjudicar adecuadamente los fundamentos técnicos, experiencia y razonamiento pericial ofrecido por el doctor Miranda, perito de la parte apelante. No le asiste la razón.

Si bien es cierto que el foro *a quo* expresó en la *Sentencia Enmendada* apelada que le adjudicaba un valor probatorio mínimo al testimonio del doctor Miranda, perito de la parte apelante, mientras que el perito de la parte apelada, doctor Gómez Marcial, le mereció entera credibilidad, lo cierto es que ambos galenos coincidieron en la baja probabilidad de que una aguja hipodérmica se parta.[31] En fin, este Foro evaluó con detenimiento la TPO y lo cierto es que, mientras que el doctor Miranda reconoció que es más probable que ese tipo de aguja, antes de partirse, se doble; el doctor Gómez Marcial enfatizó que es sumamente difícil que una aguja quirúrgica o hipodérmica se parta.[32]

Así, procedemos a la discusión conjunta los señalamientos de error sexto y octavo, debido a que se encuentran estrechamente relacionados. En virtud de estos, la parte apelante adujo que el foro primario erró al no considerar como determinación de hecho que la

---

[31] Véase, determinación de hechos núm. 24 y 61; *Sentencia Enmendada*, págs. 5 y 7. Entrada Núm. 156 del caso núm. FA2021CV00094 del SUMAC.
En la TPO, véase la pág. 85 del primer día de juicio (testimonio del doctor Miranda; 21 de enero de 2025) y la pág. 111 del tercer día de juicio (testimonio del doctor Gómez; 20 de febrero de 2025). Entrada Núm. 19 del caso núm. TA2025AP00127 del SUMAC TA.
[32] Véase, pág. 85 del primer día de juicio (testimonio del doctor Miranda; 21 de enero de 2025) y la pág. 111 del tercer día de juicio (testimonio del doctor Gómez; 20 de febrero de 2025). Entrada Núm. 19 del caso núm. TA2025AP00127 del SUMAC TA.

técnica utilizada por la doctora Acevedo Cuevas; a saber, introducir agujas para localizar un cuerpo extraño, carece de respaldo en la literatura médica y que no se ajusta a la mejor práctica, según testificó el doctor Miranda. Asimismo, argumentó que el foro *a quo* incidió al rechazar enmendar la determinación de hecho núm. 55 para eliminar la referencia a "aguja de coser", a pesar de que dicha frase no fue utilizada en juicio, y proceder solo a sustituirla por el término "alfiler", que tampoco se utilizó en juicio. Estos errores no se cometieron.

Luego de evaluar la *Sentencia Enmendada* apelada y la TPO, reconocemos que hubo controversia respecto a cómo catalogar el segundo cuerpo extraño que un cirujano extirpó del pie derecho de De Jesús Figueroa. En la determinación de hechos número 55 de la *Sentencia* original, el foro primario consignó haber considerado probado que "la aguja metálica extraída del pie derecho de la Sra. De Jesús es una aguja de cocer [sic]", mientras que en la *Sentencia Enmendada* apelada sustituyó el término "aguja de coser" por "alfiler".

Según surge del testimonio del doctor Gómez Marcial, el término utilizado en el reporte de patología que recogió el análisis de ese segundo cuerpo extraño fue "*metallic needle*". Sin embargo, somos del criterio que, a la luz de la totalidad de las circunstancias y luego de analizar de modo integral toda la prueba presentada, no se trata de un aspecto medular. Ello, toda vez que, como se ha discutido, la totalidad de la prueba -con especial énfasis en los testimonios de ambos peritos- apunta a que la probabilidad de que se partiera la aguja hipodérmica utilizada por la apelada en la primera intervención es casi inexistente.[33] De este modo, y en la

---

[33] Sobre este particular, el foro *a quo* concluyó que ambos peritos coincidieron en que era improbable que el instrumento utilizado por la doctora Acevedo Cuevas fuese el cuerpo extraño que finalmente se extrajo del pie derecho de De Jesús Figueroa, por lo cual "asociar el daño con el instrumento utilizado en el procedimiento realizado en el pie de la paciente el 2 de septiembre de 2018 por la

medida que la parte apelante no probó que el segundo cuerpo extraño que se le extrajo del pie, fuera la aguja que utilizó la apelada para removerle el cristal, resulta también inmaterial profundizar respecto a si la técnica utilizada por la doctora Acevedo Cuevas encuentra apoyo en la literatura médica o sobre si se ajusta a la mejor práctica de la medicina.

En el noveno error señalado, la parte apelante expuso que el foro *a quo* erró al negarse a emitir determinaciones adicionales propuestas por la parte apelante, relacionadas con la falta de documentación clínica relevante en el expediente médico. Así también, determinaciones adicionales pertinentes a las omisiones en la descripción de la herida y el procedimiento realizado, lo que, conforme a la jurisprudencia vigente, afecta la credibilidad del médico tratante. No le asiste la razón.

Somos conscientes de que la suficiencia de documentación clínica relevante en el expediente médico del Naguabo Medical Mall, por parte de la apelada en el ejercicio de su intervención a De Jesús Figueroa, también fue objeto de la prueba presentada. No obstante, y a pesar de que el foro primario omitió abundar sobre el particular en la *Sentencia Enmendada* apelada, consideramos que no desfiló evidencia conducente a demostrar, mediante preponderancia de la prueba, que la doctora Acevedo Cuevas incurriera en omisiones al llenar el expediente que constituyesen la causa próxima de los daños alegados en la *Demanda* de epígrafe.

Sobre lo anterior, es preciso enfatizar que, de conformidad con la prueba presentada, al momento de ocurrir los hechos que dieron origen a la *Demanda*, la doctora Acevedo Cuevas atendió a De Jesús Figueroa en calidad de médico generalista de turno en el Naguabo Medical Mall. La prueba desfilada demostró que dicha institución

---

Dra. Acevedo **resulta especulativo**". (Negrillas suplidas). *Sentencia Enmendada*, pág. 14. Entrada Núm. 156 del caso núm. FA2021CV00094 del SUMAC.

médica operaba como un Centro de Diagnóstico y Tratamiento (CDT) y, si bien pudo haber faltado precisión y atención a ciertos detalles en el expediente médico, no se demostró alguna relación causal entre este aspecto y los daños alegados en la *Demanda* de epígrafe.

Además, somos del criterio que la apelada documentó lo necesario para satisfacer el estándar mínimo de cuidado de emergencia aplicable a instituciones médicas tipo CDT. En específico, la doctora Acevedo Cuevas "documentó en el expediente una laceración penetrante en el pie derecho", además de que le "recetó antibióticos y cuidado local", así como le "brindó instrucciones sobre el cuidado de la laceración".[34] En ese sentido, coincidimos con el foro primario al concluir que el doctor Miranda, perito de la parte apelante, procuró "imponer exigencias inconsistentes con una sala de emergencia de un cuidado médico primario como lo es el Naguabo Medical Mall".[35]

Mediante el décimo señalamiento de error, la parte apelante adujo que el foro primario se equivocó al otorgarle mayor peso a la teoría especulativa de la apelada, quien manifestó que la aguja metálica pudo haberse introducido en el pie de De Jesús Figueroa con posterioridad a la intervención médica. Ello, a pesar de que la prueba desfilada demuestra que, con la mayor probabilidad, el cuerpo extraño fue introducido durante el procedimiento realizado por la doctora Acevedo Cuevas. Este error tampoco se cometió.

En la determinación de hechos número 67 de la *Sentencia Enmendada* apelada, el foro *a quo* hizo constar, de conformidad con la credibilidad y alto valor probatorio que adjudicó al perito de la apelada, doctor Gómez Marcial, que acogió su opinión respecto a que "el cuerpo extraño que finalmente se extrajo del pie derecho de

---

[34] Véase, determinación de hechos núm. 7 y 9; *Sentencia Enmendada*, pág. 4. Entrada Núm. 156 del caso núm. FA2021CV00094 del SUMAC.
[35] *Sentencia Enmendada,* pág. 15. Entrada Núm. 156 del caso núm. FA2021CV00094 del SUMAC.

la Sra. Irma De Jesús llegó a su pie con posterioridad a la intervención de la Dra. Acevedo Cuevas".[36] De forma cónsona, el foro primario concluyó que la apelada "pasó prueba creída por nosotros de que el cuerpo extraño finalmente extraído del pie de la Sra. De Jesús llegó a su pie luego de la intervención de la Dra. Acevedo, por lo que no le podemos imponer responsabilidad por ello".[37] Coincidimos con el análisis del foro *a quo* a estos fines y le brindamos deferencia.

Analizada la totalidad de la prueba, salta a la vista que, no solo era altamente improbable que la aguja que utilizó la doctora Acevedo Cuevas se hubiese partido durante la intervención. De forma cónsona, resalta que el "*metallic needle*" que finalmente se extrajo del pie de De Jesús Figueroa no se encontraba en la misma localización que el lugar de la zona plantar donde se hallaba el vidrio, ya que se encontraba *recto entre los dedos del pie*.[38]

En cuanto a este señalamiento, tenemos que resaltar el hecho de que De Jesús Figueroa se vio imposibilitada de testificar durante el juicio, debido a su condición de Alzheimer.[39] En consecuencia, no fue posible indagar sobre el origen del segundo cuerpo extraño. Así las cosas, cuando a esa particularidad se le suma el hecho de que la parte apelante tampoco probó que la actuación de la doctora Acevedo Cuevas fuese la causa próxima de ese evento, es forzoso concluir que la apelada no es responsable de cualquier daño reclamado por la parte apelante a esos fines.

---

[36] *Sentencia Enmendada*, pág. 8. Entrada Núm. 156 del caso núm. FA2021CV00094 del SUMAC.

[37] *Sentencia Enmendada*, pág. 15. Entrada Núm. 156 del caso núm. FA2021CV00094 del SUMAC.

[38] Véase, determinación de hechos núm. 23; *Sentencia Enmendada*, pág. 5. Entrada Núm. 156 del caso núm. FA2021CV00094 del SUMAC.

[39] En la determinación de hechos núm. 33, el foro *a quo* dispuso lo siguiente: "La Sra. De Jesús no declaró durante el juicio por estar incapacitada por una condición de Alzheimer diagnosticado y no tiene recuerdos de los eventos". *Sentencia Enmendada*, pág. 5. Entrada Núm. 156 del caso núm. FA2021CV00094 del SUMAC.

Por último, mediante el undécimo error señalado, la parte apelante cuestionó que el foro primario rehusara reconsiderar la sentencia, a la luz de la totalidad de la prueba desfilada. A juicio de la parte apelante, la totalidad de la prueba estableció que la actuación de la doctora Acevedo Cuevas se apartó de la mejor práctica médica y fue causa próxima de los daños reclamados. Al igual que los señalamientos de error anteriores, este tampoco se cometió. Así, por considerar que lo discutido para adjudicar los planteamientos anteriores dispone de lo aquí planteado, no amerita análisis ulterior. Procede confirmar la *Sentencia Enmendada* apelada.

**IV**

Por los fundamentos que anteceden, se confirma la *Sentencia Sentencia Enmendada* apelada. De este modo, en la medida que esta sustituye a la *Sentencia* emitida el 27 de marzo de 2025 y notificada al día siguiente, no corresponde que este Foro realice algún pronunciamiento sobre este dictamen.

Lo acordó y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones